[Civ. No. 1940. Third Appellate District.—March 13, 1919.]

CALIFORNIA LAND SECURITY COMPANY (a Corporation), Appellant, v. DON RITCHIE et al., Respondents.

[1] VENDOR AND VENDEE—SALE OF LAND—QUANTUM OF ESTATE.—Where one party agrees to convey, and the other party agrees to purchase, all the former's right, title, and interest in and to his real estate, such contract means the sale and purchase of such interest as the first party has in the premises, and not any particular estate or fee simple.

[2] BROKER'S COMMISSIONS—SALE OF PROPERTY—TERMS UNSATISFACTORY—DUTY OF VENDOR.—Where property is sold to a purchaser able, ready, and willing to take and pay for the property, and any of the terms of the contract, abstract, or deed are unsatisfactory to the intending vendor, the latter should object to them on that ground and not refuse absolutely to sell; and where he fails to make such objection under such circumstances, he will be held liable to the broker negotiating the sale for his commissions if he refuses to accept the purchaser.

[3] ID.—CONFLICTING EVIDENCE—FINDING.—The finding of the trial court as to what transpired when the broker presented the contract of purchase to the intending vendor is conclusive on the appellate court where the evidence was conflicting.

[4] VENDOR AND VENDEE—TERMS OF PAYMENT—CHECK NOT CASH.—The terms "one-half down and the balance in five equal annual payments" mean a payment in cash down; and, though a payment by check may be a "cash payment," the vendor cannot be required to accept that mode of payment. If he objects to it, the objection is good and he need not bind himself to convey until the objection is removed by the offer at the time of a different method of payment, reasonable in character and satisfactory to him.

[5] ID.—CONTRACT OR OPTION—TEST.—The test determinative of the question whether a given agreement relating to the sale and purchase of land is an agreement to purchase and sell the property or

a mere option to purchase the same is: Is the agreement capable of specific performance?

[6] ID.—RIGHT OF ELECTION IN VENDEE—SPECIFIC PERFORMANCE.—An agreement relating to the sale and purchase of land which gives to the buyer the choice of either purchasing the property on stated terms or refusing to complete the purchase and so forfeiting to the seller a sum fixed in the contract as damages for such noncompliance, is wanting in mutuality and, therefore, not capable of specific performance.

[7] BROKER'S COMMISSIONS—DUTY OF AGENT.—A broker, to be entitled to the agreed commission, must produce a purchaser able, willing, and ready to purchase; and where he produces a proposed purchaser, who reserves to himself the right of election either to purchase or arbitrarily refuse to do so, or to refuse to purchase, even though a perfect title be shown, the broker has not produced a purchaser ready and willing to purchase, even though he has the ability to do so.

[8] ID.—EXCLUSIVE AGENCY—SALE BY OWNER.—Where the agreement vests in the broker an exclusive agency and so makes it the sole agent for the sale of the property for a given period, but does not confer on such broker the exclusive right to sell, the owners, either collectively or individually, might, pending the period of the agency and before the broker has secured a purchaser or a valid agreement from a proposed purchaser willing and able to make the purchase according to the authorization to sell previously executed, sell or make sale without becoming liable for commissions.

APPEAL from a judgment of the Superior Court of San Joaquin County. J. A. Plummer, Judge. Affirmed.

The facts are stated in the opinion of the court.

Hawkins & Hawkins for Appellant.

Carlton C. Case for Respondents.

HART, J.—Plaintiff brought the action to recover $6,227.50 as commissions for having found a purchaser for certain lands of defendants. From a judgment in favor of defendants for costs, plaintiff prosecutes this appeal.

The action is based, first, upon what is termed by the parties and what we shall herein call a "brokerage contract," which reads as follows:

"Oakland, Cal., Mar. 1st, 1916.

"Calif. Land Security Co.,
   "San Francisco, Cal.

"Gentlemen:

"You are authorized to sell all our interest in the Ritchie Ranch in Stanislaus Co., Calif., at the price of seventy dollars per acre for the front land containing 1350 acres and forty dollars per acre for the river land containing 284 acres.

"Terms to be one-half down and the balance in five equal annual payments at six per cent interest.

"In case a sale is made you are to receive five dollars per acre so far as our interest appears in said purchase price.

"This agreement can be canceled by giving thirty days notice in writing and to be exclusive for thirty days or until notice is given to C. B. Hubbard or to Calif. Land Security Co., of San Francisco.

"Yours truly,
                "Don Ritchie.
                "Mrs. Josie M. Ritchie.
                "Mrs. Belle Lightner."

On the sixteenth day of March, 1916, plaintiff presented to the defendants, Don Ritchie and Mrs. Josie M. Ritchie, a document of which the following is a copy:

"This agreement, made and entered into this 13th day of March, 1916, by and between F. H. Arnsburger, the party of the first part, and Josie M. Ritchie, Don Ritchie and Belle Lightner, the parties of the second part,

"Witnesseth: That the party of the first part agrees to purchase from the parties of the second part, and the parties of the second part agree to sell to the party of the first part all their right, title, estate and interest in and to that certain tract of real estate situated in the county of Stanislaus, state of California, and particularly bounded and described as follows, to wit: [Describing land known as the 'J. M. Ritchie Ranch.']

"It is understood that 80 acres of said tract of land belongs to Josie M. Ritchie in severalty and the rest of said land the second parties own in common, each owning an undivided one-fourth interest therein.

"The party of the first part agrees to pay for said land at the rate of $70.00 per acre for the front land, being the southwesterly portion of said land and comprising 1350 acres and

at the rate of $40.00 per acre for the river land comprising 284 acres; and the party of the first agrees to pay to the parties of the second part on the sale the sums set opposite the respective names, to wit:

"Josie M. Ritchie, the sum of $30,665.00

"Don Ritchie, the sum of $25,065.00

"Belle Lightner, the sum of $25,065.00;

and agrees to pay said purchase price as follows: One-half in cash at the time of delivery of deed, and the balance to be evidenced by a note secured by a mortgage payable in five equal annual payments with interest at the rate of six per cent. per annum. . . .

"It is also understood and agreed that a mortgage in form substantially like that ordinarily in use by the Stockton Savings and Loan Society will, subject to the terms hereof, be used. Taxes shall be pro-rated as of the time of delivery of deed.

"It is understood that the party of the first part shall have a reasonable time to examine the title to said land and if the title is imperfect and cannot be perfected within sixty days after written notice to C. B. Hubbard of the defect, the deposit may be returned and the parties of the second part agree to convey their said interest in said premises as above defined, to the party of the first part with a valid title free and clear of encumbrances.

"It is understood and agreed that the sum of $100.00 has been paid by the party of the first part to C. B. Hubbard, the agent of the parties of the second part, as a deposit upon said land, and the party of the first part shall pay the balance of one-half of the purchase price above mentioned to the parties of the second part after he shall have had a reasonable time to examine the title to said land, and if the title to said land is a valid title and free and clear of encumbrances and the party of the first part refuses to complete and carry out this contract, then in that case the money paid to C. B. Hubbard shall be forfeited to and belong to the parties of the second part as liquidated damages, and this contract shall thereupon become null and void.

"In witness whereof the parties hereto have hereunto and in duplicate set their hands and seals the day and year first above written.

"F. H. ARNSBURGER.   (Seal)"

Then followed the certificate of a notary public that said Arnsburger had acknowledged and executed said instrument before him.

The court found that the foregoing agreement was signed by Arnsburger; that it was presented to the defendants, the Ritchies, to be signed, together with the offer of a check for one hundred dollars; that the Ritchies refused to sign it and declined to accept said check; that the said agreement was never presented to the defendant, Lightner, for her signature; that plaintiff never thereafter made any other or further request or demand upon the defendants to sign said instrument; that, prior to the fifteenth day of March, 1916, and before said Arnsburger signed said agreement of purchase and sale, the defendant, Lightner, without the assistance of the plaintiff, found a purchaser and thereupon sold and conveyed all her interest in the land described in the brokerage contract with the plaintiff, and that said sale was not made to defraud or deprive plaintiff of its commissions; that eighty acres of said ranch was owned in severalty by Josie M. Ritchie, and that the balance, consisting of 1,554 acres, was owned, an undivided one-fourth by Josie M. Ritchie, an undivided one-fourth by Belle Lightner, and an undivided one-fourth by John Raggio and Edward F. Harris; that when said Arnsburger executed said contract he did not know that the said Raggio and Harris owned an undivided one-fourth of the 1,554 acres or that they or either of them were owners of or interested in said land or any part thereof; that the plaintiff never found or presented to the defendants, or any of them, a purchaser or prospective purchaser ready, able, and willing to purchase the property described in said brokerage contract, in accordance with the terms of said contract, or to purchase the interest of the defendants in and to said land upon the terms expressed in said brokerage contract; that said Arnsburger was not, on the nineteenth day of March, 1916, or at the time he signed said contract of sale, or at any time while said brokerage contract was in effect, ready or willing to purchase the interest of the defendants in and to the said land, and that plaintiff did not perform the terms and conditions of said brokerage contract by it to be performed, "and did not perform the services required of it by the terms and conditions of said brokerage contract"; that the defendants never refused or declined to carry out the terms of the brokerage

contract, "but at all times, when the same was in force, stated that they were willing and ready to perform the terms and conditions of said contract on their part to be performed."

The general objection raised by the appellant to the result reached by the court below is that the findings that the plaintiff did not produce before the respondents a purchaser able, ready, and willing to purchase the lands described in the brokerage contract and that the respondents "were, at all times, when the same was in force, willing and ready to perform the terms and conditions of said contract on their part to be performed," are not supported by the evidence.

The specific points made by the respondents in support of the judgment are: 1. That there is a material variance or difference between the agreement of the plaintiff and the proposed agreement of sale signed by Arnsburger and submitted by the appellant to the respondents for their approval and signatures, particularly in that, while the brokerage agreement authorized the appellant to sell such *interest* only as respondents have in the land, the proposed agreement of purchase signed by Arnsburger called for the sale to him by the respondents of the land itself—a distinction quite important in almost all transactions involving agreements to convey real property; 2. That the so-called agreement of purchase signed by Arnsburger was not an agreement of sale and purchase, but a mere option to purchase.

The learned trial judge, on deciding the case, filed a written opinion in which he held that the objection first above stated to the agreement proposed and submitted by the appellant to the respondents for the latter's approval is well taken; that in his opinion the contract between the appellant and the respondents went no further than to authorize the former to negotiate the sale of the interest only of the respondents in the land, while the proposed agreement of purchase provided for a sale of the land itself, and that the respondents were, therefore, justified in refusing to sign the latter agreement as not conforming in a vital particular to the appellant's authority to negotiate the sale. Upon this theory, the court held and decided that the appellant did not bring to the respondents a purchaser able, willing, and ready to purchase their interest in the land upon the terms and conditions specified in its authorization to sell, and that, consequently, it was entitled to no compensation for any services it had per-

formed or trouble and expense to which it had gone to procure the agreement signed by Arnsburger.

The Arnsburger agreement, it will be observed, contains the following paragraph: "It is understood that the party of the first part shall have a reasonable time to examine the title to said land, and, if the title is imperfect and cannot be perfected within sixty days after written notice to C. B. Hubbard of the defect, the deposit may be returned, and the parties of the second part agree to convey their said interest in said premises as above defined, to the party of the first part, with a valid title, free and clear of any encumbrances." It is undoubtedly true that this language appears to go beyond the scope of the written authorization vested in the appellant to sell the land. As seen, the latter instrument authorized the appellant to find a purchaser of such interest only as the respondents have in the land. It nowhere authorized him to find a purchaser of the land itself, as appears to be the proposition involved in the purported agreement of sale and purchase. [1] As is pointed out in the opinion of the learned trial judge, the cases seem to be quite uniform upon the proposition that where one party agrees to convey, and the other party agrees to purchase, all the former's right, title, and interest in and to his real estate, such contract merely means the sale and purchase of such interest as the first party has in the premises, and not any particular estate or fee-simple. (See *Ward* v. *Foley*, 141 Fed. 364, 366, [72 C. C. A. 140]; *Henderson* v. *Beatty*, 124 Iowa, 163, [99 N. W. 716]; *Reynolds* v. *Shaver*, 59 Ark. 299, [43 Am. St. Rep. 36, 27 S. W. 78]; *Van Rensselaer* v. *Kearney et al.*, 11 How. (U. S.) 297, [13 L. Ed. 703, see, also, Rose's U. S. Notes].)

It is contended by the appellant, however, that it was the duty of the respondents to point out specifically, at the time the Arnsburger agreement was presented to them for their approval and signatures, any objections they had to that instrument or any of its covenants; that they failed to do so or, at any rate, did not object to it on the ground that, in its scope, it transcended the terms of the brokerage agreement between them and the appellant, and that, having so failed to state such objections, it is now too late to object to any purpose. This is the most serious problem presented in connection with the point we are now considering, assuming, of course, as we shall at all times assume for the purpose of con-

sidering said point, that the Arnsburger agreement involved a contract of sale and purchase.   [2]   It has been held, upon the soundest of reason, that where a broker has negotiated the sale of real property to a purchaser able, ready, and willing to take and pay for the property, and any of the terms of the contract as to payment, or the abstract or deed are unsatisfactory to the intending vendor, the latter should object to them on that ground and not refuse absolutely to sell; and that where he fails to make such objection under such circumstances, he will be held liable to the broker negotiating the sale for his commissions if he refuses to accept the purchaser.   (*Smith* v. *Keeler*, 151 Ill. 518, [38 N. E. 250]; *Fenn* v. *Ware*, 100 Ga. 563, [28 S. E. 238]; *Donley* v. *Porter*, 119 Iowa, 542, [93 N. W. 574]; *Blood* v. *Shannon*, 29 Cal. 393; *Fiske* v. *Soule*, 87 Cal. 313, [25 Pac. 430].)

Don Ritchie testified that he did not like the language of the contract.   He could not, or at least did not, give any particular reason for his objection to the instrument itself.   He did testify, though, that he said to the appellant, when the latter presented the instrument to him and his mother for their signatures, that he did not know Arnsburger or know anything of him, and that he would prefer meeting that gentleman personally before he and his mother entered into a binding agreement of any sort, or language to this effect. His reasons for desiring personally to meet and know something of the proposed purchaser before going further with the deal, he said, were that the plaintiff had had previous options on or agreements to sell the same property, and had telegraphed or telephoned him at Bakersfield to go to Stockton and meet persons who had agreed to buy the property, and that in each of such instances the efforts of the plaintiff to drive a bargain with such parties had failed.   He therefore wanted to know with certainty from some investigation of his own that Arnsburger was not only willing to buy their interest, but able and ready to do so.   He further testified that he refused to accept the check for one hundred dollars tendered by the plaintiff to him and his mother as ''earnest-money'' or a penalty for failure to complete the deal because of his objection to that method of the payment of that sum for the purpose stated, adding that he had lost confidence in the plaintiff or its representatives.   [3]   This story of what occurred on the occasion of the submission of the Arnsburger agree-

ment to the respondents was flatly contradicted by the witness, Hubbard, president and general manager of the plaintiff, who conducted the transaction on behalf of plaintiff, but the court having accepted it as true, we are required to consider the proposition to which it relates accordingly.

As to the first ground of objection, we seriously question its validity. The second ground, though, possesses some force. Indeed, we think it was sufficient to justify the respondents in refusing to sign the instrument, and unless removed within a reasonable time, to decline absolutely to sell the property to Arnsburger. The terms specified in said instrument, as to payment, were "one-half down and the balance in five equal annual payments," etc. [4] This meant a payment in cash down, and, though a payment by check may be a "cash payment," the vendor cannot be required to accept that mode of payment under such an agreement. If he objects to it, the objection is good and he need not bind himself to convey until the objection is removed by the offer at the time of a different method of payment, reasonable in character and satisfactory to him. It appears from the evidence—in fact, it was admitted by Hubbard—that this objection was not removed or overcome, the check having been returned by Hubbard to Arnsburger within a few days after the time that the Ritchies refused to sign the purported agreement of sale and no other offer of such payment made.

The foregoing discussion has been, as seen, upon the assumption that the instrument submitted to the Ritchies by the appellant for their signatures was an enforceable contract to sell and purchase. But the question arises upon a consideration of the following covenant in said agreement whether it is such an agreement or a mere option to purchase the property: "It is understood and agreed that the sum of $100.00 has been paid by the party of the first part to C. B. Hubbard, the agent of the parties of the second part, as a deposit upon said land, and the party of the first part shall pay the balance of one-half of the purchase price above mentioned to the parties of the second part after he shall have had a reasonable time to examine the title to said land, *and if the title to said land is a valid title and free and clear of encumbrances and the party of the first part refuses to complete and carry out this contract, then in that case the money paid to C. B. Hubbard shall be forfeited to and belong to the parties*

*of the second part as liquidated damages, and thereupon this contract shall become null and void."*

[5]   The test determinative of the question whether the said agreement, containing as it does the foregoing covenant, is an agreement to purchase and sell the property described therein or a mere option to purchase the same is: Is said agreement capable of specific enforcement?

There are two classes of contracts for the conveyance of lands, in which penalties are annexed for the breach of the covenants thereof, and in one of which classes specific performance will be decreed and in the other denied, viz.:

1. Where the contract contains a stipulation for the payment of sums of money, called penalties or liquidated damages, the sole purpose of which stipulation is to secure the performance of the contract or the acts specified therein to be performed. Thus, in *Koch* v. *Streuter*, 218 Ill. 546, [2 L. R. A. (N. S.) 210, 75 N. E. 1049], which was an action to reform a contract for the sale of real property and for the specific performance of the same when reformed in the particular prayed for in the bill, the contract contained a covenant or stipulation that "if either party fails to keep or perform the covenants hereinabove specified said party so defaulting shall forfeit to the other the sum of $1,000.00, said sum being the agreed liquidated damages," and the Illinois supreme court held that said stipulation for liquidated damages was intended "merely as a security for the performance of the contract and that there is nothing in the terms of the contract to justify the conclusion that either party has the right to perform the contract, or in lieu thereof, to pay the sum of $1,000.00." The court concluded: "As the contract, therefore, is not alternative in its nature, a court of equity is not ousted of its jurisdiction to decree a specific performance by reason of the condition contained in the contract in reference to the forfeiture of one thousand dollars as agreed liquidated damages."

2. Where there is inserted in the contract a covenant or stipulation that the party who is to perform the contract may at his election do one of two things—that is, where the stipulation is that the proposed purchaser may either consummate the purchase or, in default thereof, pay to the seller a certain specified sum as liquidated damages for the breach or the failure to purchase—in which case the agreement is to be con-

strued as a mere option whose terms are incapable of specific enforcement.

The distinction thus noted is considered and stated by the supreme court of Texas as follows in *Redwine* v. *Hudman*, 104 Tex. 21, [133 S. W. 426] : "The question always is: What is the contract? Is it that one act shall be done, with a sum annexed, whether by way of penalty or damages, to secure the performance of the contract? Or is it that one or two things shall be done at the election of the party who has to perform the contract, namely, the performance of the act or the payment of the sum of money? If the former, the fact of the penal or other like sum being annexed will not prevent the court enforcing the performance of the very act, and thus carrying into execution the intention of the parties. If the latter, the contract is satisfied by the payment of a sum of money, and there is no ground for proceeding against the party having the election to compel the performance of the other alternative." (See, also, Fry on Specific Performance, sec. 115; 36 Cyc. 571, 572.)

[6] While the proposed agreement here does not directly or in so many words provide that the proposed buyer may refuse to carry out and complete the contract, the language of the instrument necessarily implies as much, and thus would as clearly and effectually vest that right in the proposed purchaser as if it were directly expressed. If signed by the Ritchies, it would give to the buyer the choice of two alternatives, namely: Either to purchase the property on the terms stated or refuse to complete the purchase and so forfeit to the sellers the sum of one hundred dollars fixed in the contract as the damages for such noncompliance. This construction necessarily follows from the provision that the proposed vendee might refuse to purchase the property, notwithstanding that the title to the same was found to be valid or merchantable, the provision for liquidated damages in the sum of one hundred dollars to be forfeited to the sellers in the event of the refusal by the proposed purchaser to carry out his part of the contract, and the provision that upon the happening of the contingencies named "this contract shall become null and void." No other language was necessary to to be added to that covenant of the agreement to make it any clearer than it is that the intention of Arnsburger as therein expressed was to reserve to himself the right of election to

buy or not to buy the property in any event, in case the instrument had been signed by the Ritchies.

[7] Clearly, therefore, the instrument was one of those contracts looking to the sale and purchase of real property which are incapable of specific enforcement. It would be, if signed by the Ritchies, wanting in that mutuality between the parties which must be shown to exist in such contracts before their specific performance by the parties thereto can be decreed. Indeed, if, upon the happening of the contingencies named, the "contract shall become null and void," how could the instrument be specifically enforced after the happening of those contingencies? Obviously, if the contingencies happened which would render the agreement "null and void," there could then be no agreement to enforce.

It would seem unnecessary to cite authorities to support the above proposition, but agreements similar to the one here have been considered by courts of other jurisdictions and held not to be subject to specific performance. Some of the cases it will do no harm to refer to herein.

In *Crum* v. *Slade & Bassett,* (Tex. Civ.), 154 S. W. 351, which was an action to recover commissions for the sale of real property, the agreement provided for the payment to the seller of the sum of two thousand dollars, "as part of the cash payment, to be forfeited to the seller in the event the buyer upon approval of the title to said lands, after being furnished abstracts and deeds, as aforesaid, fails or refuses to perform his part of this contract. . . . In the event the buyer forfeits the two thousand dollars paid and the contract is thereby *at an end* (italics ours) that said sum is to be divided" between the seller and the brokers negotiating the sale in certain specified proportions. The court of civil appeals of Texas held that the language quoted, particularly that which we have put in italics, clearly indicated an intention to vest the purchaser with the right either to carry out the agreement or refuse to do so at the expense of the forfeiture of the cash money paid down on the execution of the agreement by the seller, and accordingly ruled that the agreement amounted to no more than an option, incapable of specific enforcement.

Similarly, it was held by the same court, in *Simpson* v. *Eardley* (Tex. Civ.), 137 S. W. 378 (in which a writ of error

40 Cal. App.—17

was denied by the supreme court of Texas), as to an agreement procured by a broker for the sale of certain real estate, which provided, *inter alia,* that "should said title be approved by the attorneys for the parties of the second part, and they fail or refuse to comply with the terms of this contract, then said sum of one thousand dollars earnest-money (the contract providing that that sum should be paid down by the purchaser on the execution thereof by the seller), shall be forfeited to the party of the first part and treated as liquidated damages." The court in that case said: "It will be seen that by said contract Bell and Robinson did not agree to become purchasers of the land; that is to say, they did not agree to buy the land, because they expressly reserved the right not to take it and let the one thousand dollars go to defendants as a forfeit or liquidated damages. Eardley could not, upon that contract, have enforced specific performance, consequently it was not a contract of sale, binding as such on Bell and Robinson in any view, but, at their election, it was a sale or an option according to how they saw fit to treat it. . . . It is clear that defendant, in case of an arbitrary refusal on the part of Bell and Robinson to take the land, was cut off from any right to insist on performance by them, and had to take the one thousand dollars or nothing."

In *Rankin* v. *Grist et al.,* 61 Tex. Civ. 484, [129 S. W. 1147], and *Moss and Raley* v. *Wren,* 102 Tex. 567, [113 S. W. 739, 120 S. W. 847], agreements of like import were held to confer upon the proposed purchaser the right to elect between consummating the purchase and the refusal to purchase, with resultant forfeiture of money to be paid down on the execution of the agreements by the proposed sellers. In both said cases it was held that the agreements could not be specifically enforced.

It is, of course, very clear from the foregoing views and conclusion that the plaintiff did not procure in Arnsburger a purchaser of the land mentioned in the agreement able, willing, and ready to purchase upon the terms specified in the brokerage agreement or at all, and, therefore, is not entitled to the compensation provided in its agreement for its services in negotiating the sale of the property. Of course, as appellant declares, it is to be conceded to be a well-settled proposition that, where a broker, when employed merely to negotiate a sale of real estate, "has found a purchaser able,

ready, and willing to purchase upon the vendor's terms, his right to the agreed commissions is complete, and does not depend upon the final acceptance by the purchaser of a conveyance of the property sold, nor is it contingent upon the consummation of the sale." (*Gunn* v. *Bank of California,* 99 Cal. 349, [33 Pac. 1105].)   And it is equally true that where the broker procures a party able to purchase the property upon the vendor's terms and is willing and ready to do so, no act of the vendor whereby the sale fails of consummation can have the effect of depriving the broker of his commissions. Even the failure of the vendor to present a good or merchantable title to the property cannot have that effect, unless there be in the brokerage contract a covenant so providing. But the broker, to be entitled to the agreed commissions, must produce a purchaser able, willing, and ready to purchase; and where, as here, he produces a proposed purchaser, who reserves to himself the right of election either to purchase or arbitrarily refuse to do so, or to refuse to purchase, even though a perfect title be shown, then the broker has not produced a purchaser ready and willing to purchase, even though he has the ability to do so.   It follows that the plaintiff has not made out a case entitling it to recover as against the Ritchies.

As to the defendant, Lightner, it appears that she had disposed of her interest in the land described in the agreements, and that the Arnsburger agreement was never presented to her by the plaintiff or any other person for her signature. That she had the right to sell her interest, notwithstanding the brokerage contract with the plaintiff pending the life of said contract, is not a debatable proposition when we examine the said agreement.   [8]   It will be observed that, while the agreement vested in the plaintiff an exclusive agency and so made it the sole agent for the sale of the interest of the defendants in the premises for the period of thirty days, it did not confer upon the plaintiff the exclusive right to sell said interest.   As the learned trial judge declared in his opinion: "Under such conditions, the defendants, collectively or individually, might, pending the period of the agency and before the broker had secured a purchaser or a valid agreement from a proposed purchaser willing and able to make the purchase according to the authorization to sell previously executed, sell or make sale without becoming liable for com-

missions." The proposition as thus stated is sustained by many cases, notable among which are *Dreyfus* v. *Richardson*, 20 Cal. App. 800, [130 Pac. 161], and *Snook* v. *Page*, 29 Cal. App. 246, [155 Pac. 107]. It results that, under the circumstances as disclosed here as to the defendant, Lightner, she could in no event be held liable to the plaintiff for commissions for procuring a purchaser of her interest.

Agreeably to the views herein set forth, the judgment appealed from is affirmed.

Buck, P. J., *pro tem.*, and Burnett, J., concurred.