[Civ. No. 18486.   Second Dist., Div. One.   Mar. 10, 1952.]

SAMUEL KRITT, Appellant, v. ATHENS HILLS DEVEL-
OPMENT COMPANY (a Corporation), Respondent.

Cotlow, Schwartz & Baerwitz for Appellant.

Frank J. McCarthy for Respondent.

HANSON, J. pro tem.—In its final analysis the question
for decision is whether a broker who was engaged to sell
143 lots with homes to be completed thereon was entitled
under the terms of his written contract with the seller to

a commission of $50 the moment the seller approved a buyer's written conditional proposal to buy a lot or only when the proposal was consummated. A subsidiary question is whether the broker abandoned his rights under the contract by want of performance on his part.

The defendant development company which was the owner of the 143 lots here in question, along with some 50 other lots in the subdivision, was engaged in the business of selling lots with homes to be constructed thereon of a character to be selected by the buyer from a group of plans and specifications it had prepared for the purpose.

The plaintiff, a real estate broker, having been employed as a broker to find a purchaser of 50 lots for the defendant, for which he was paid his commission, thereupon sought an exclusive agency with the defendant to represent it in the sale of the remaining 143 lots upon which homes were to be built. To that end the plaintiff caused to be prepared a written agency contract which he submitted to the defendant. This contract was thereupon executed by the plaintiff and the defendant on January 28, 1948, and will hereafter be referred to merely as the "broker's contract." This contract briefly summarized required the defendant to provide an office for the broker on the tract premises and that it advertise the lots for sale in newspapers and otherwise; that the broker's name would be placed on all advertisements, all without any expense to the broker; that it would pay to the broker $50 "for selling each and every lot and/or home"; "that if any deals for the sale of said lots and/or homes are cancelled for any reason whatsoever, any moneys deposited on said deals and declared forfeited, shall be divided equally," except that the broker was not to receive in any such division more than $50; that the seller might withdraw from the broker "the sale of any home if it is not sold 40 days after final FHA approval is received by the [seller] for said home"; that the broker would "diligently pursue and make every effort to transact deals and complete same to the best of his ability"; that he would "present all deals and sales contracts" to the seller "for approval and acceptance"; the seller not to disapprove except for just cause; that the agreement "shall be irrevocable and remain in full force and effect until each and every lot and/or home is sold and deals consummated on [the] Tract." Other provisions in the contract need not be narrated at this point.

Upon the execution of the broker's contract the broker prepared a printed contract, which we will hereafter refer to as the "buyer's option contract," and which, after a few minor changes by the defendant, was used by the broker in every instance. This latter contract by its very terms contemplated a sale not of a lot alone but of a lot with a completed house thereon.

It recited the receipt of $_____ from _____ _____. [the buyer] as part payment of "Lot \_\_\_\_\_ . . . House Plan #_____"; that the price should be the amount set by F.H.A. but in no event not more than $8,500, to be paid out of any loans made by F.H.A. or veterans 10 days after such loan or loans were available and the balance due, if any, in cash from the buyer upon the close of escrow; that upon the receipt of the whole purchase price the seller would issue its grant deed to buyer. The writing expressly contemplated that the seller would endeavor to procure the loan or loans for the buyer and if it failed to do so within 90 days that it would return any deposit made by the buyer. Moreover, the agreement recited that if the buyer did not otherwise see fit to exercise his option the seller would return his deposit except for the sum of $50, which it would retain as liquidated damages.

Before proceeding to a statement of the salient facts we wish to observe that appellant's so-called statement of the facts as set forth in his brief is not such a statement but instead is in large part a resumé of all the evidence. This is not what is intended by the Rules on Appeal. The rules contemplate a statement only of the material facts, i.e., the facts which possess weight of a character which tends to throw the decision one way or the other. We may add that respondent likewise has not been helpful to us for he too has only followed the lead of appellant by stating in the same fashion merely what he regards as "omitted facts."

At or shortly after the transactions narrated the parties ascertained that 35 out of the 143 lots were not eligible for F.H.A. loans. Nevertheless, the broker proceeded to solicit purchasers for the remaining 108 lots. Before the end of February he procured signed options, approved by the seller, along with deposits for all of these 108 lots which he turned over to the seller. Owing to the apparent public demand the broker established a waiting list, as early as March 11th, for people desiring to enter into options taking deposits from them with the assurance he would substitute them, in order,

as quickly as cancellations came in. Cancellations began as early as March 11th. As soon as the broker was advised of a cancellation he substituted another person from his waiting list. This procedure continued until June 24th when the broker, after a conference with the defendant, ceased not only this procedure but made no attempt thereafter to procure further signed options for any of the lots available. Some of the lots were optioned as many as four times before they were finally sold and conveyed. In fact, six were optioned four times; 26 were optioned three times; 67 were optioned two times and only six were optioned once.

In the interval between the execution of the broker's contract and June 24th it seems that at least 12 options were cancelled before they had been outstanding 90 days. The defendant accordingly retained out of each of the 12 deposits the sum of $50 and paid over to the broker one half thereof. By June 24th all options dated on or prior to March 24th were subject not only to cancellation for the failure of defendant to procure an F.H.A. loan but upon such a cancellation the defendant was obligated by the terms of the contract to return the deposits *in toto* without the deduction of the sum of $50. How many loans of that character had been cancelled by June 24th is not disclosed by the briefs. At all events it was plainly apparent to the broker at that time that the persons who had not cancelled could do so at any time after their option had run for 90 days and thus require the defendant to return their deposits in full. In the light of that knowledge the broker on June 24th demanded of the defendant that the broker's contract be amended so as to provide a commission of $100 rather than $50 as was provided therein. This was refused by the defendant. While the contract was not cancelled by the parties the broker thereafter did nothing towards procuring new options for any of the options which were thereafter cancelled. In short, he ceased to perform further under the contract.

In excuse of any such performance the broker contends that he was entitled to a commission of $50 on each of the 108 lots when he procured the approved options regardless of whether the option holder exercised his option, and if this be not true he was entitled to the sum because all the 108 lots were sold as a result of his and the defendant's activities; that to the extent the defendant personally or through other brokers procured completed sales the plaintiff broker

was entitled to his commission as he held an exclusive sales contract. In short, the contention here is that the defendant could not personally sell any of the lots without paying the plaintiff the commission to which he would be entitled had he sold it.

■ Turning to the language of the broker's contract we find that the broker was to be paid $50 for selling each of the 143 lots. If, however, the sale of a lot was cancelled for any reason whatever then and in that event any money deposited by the buyer ''on the deal'' which was declared forfeited by the seller was to be divided between the seller and the broker, except that the broker in any such division was not to receive more than $50 out of the division. The contract may not be interpreted, as appellant contends, as embracing within its purview option contracts of purchase, i.e., where the buyer has an option to purchase or not as he sees fit. Such a contract is not a contract of sale. (*Hicks* v. *Christeson,* 174 Cal. 712 [164 P. 395]; *Pehl* v. *Fanton,* 17 Cal.App. 247 [119 P. 400]; *California Land Security Co.* v. *Ritchie,* 40 Cal.App. 246 [180 P. 625]; *Woolley* v. *Batchelder,* 35 Cal.App. 177 [169 P. 408]; *Dreyfus* v. *Richardson,* 20 Cal.App. 800 [130 P. 161].) ■ By the terms of the broker's contract before us the broker was entitled to a commission of $50 upon a sale consummated and in case it was not consummated then to one half of the buyer's deposit (but not in excess of $50) only if the seller had declared a forfeiture of the contract, but not in the case of a cancellation without such declaration. Moreover, the contract does not give the broker the exclusive right to sell the lots. Parol evidence to show (1) that the parties intended that the broker was to receive the commission upon procuring a contract with a buyer with an option reserved in the latter to cancel; (2) that the contract gave an exclusive right to sell was inadmissible and rightly rejected by the trial court.

From what we have so far said it is evident that the broker was entitled to a commission of $50 only if the buyer he procured exercised his option and consummated the sale. There were only five instances in which this occurred. In addition to the commissions on these sales aggregating $250 the plaintiff broker was entitled, as we have said, to one half but not in excess of $50 of all deposits made by option purchasers which were declared forfeited by the seller. The proper proportion of all the deposits declared forfeited it appears

was paid to the broker. ██ The latter's contention that many deposits which were returned by the seller to the buyers should instead have been declared forfeited is without merit. In the first place the contract does not impose a duty upon the seller to declare a forfeiture where he could do so; in the second place there does not appear from the briefs to be any evidence on which the contention may be supported. The burden was on the broker to show the facts. If the broker intended to require the seller to declare forfeitures where forfeitures could be declared, he failed to insert the necessary language in the broker's contract. It is the broker's contract, not the printed form of the option contract that measures the broker's rights.

A further contention made by the broker is that he was entitled to a commission on the 35 lots sold by the defendant after July 2d. This contention is sufficiently answered by what we have so far said, i.e., that the seller had the right to sell all the lots without incurring a liability for commissions. The claim that the seller prevented the broker in August from procuring option purchasers for these lots is not sustained by the record. Moreover, it appears that the seller had sold some of these 35 lots, but just how many is not disclosed by the record. Here again the broker failed in his burden of proof. What is more to the point is that the trial court on substantial evidence not only found that the broker had abandoned his contract, but that he had ceased to perform under it. As the broker was in default for want of performance he failed in the burden of proof imposed upon him and hence was not entitled to recover upon the contract.

Other errors assigned are too inconsequential to require discussion. It is enough here to say that the court in granting judgment for $350 not only gave judgment for all that was coming to the plaintiff, but possibly $100 more.

The judgment is affirmed.

Doran, Acting P. J., and Drapeau, J., concurred.