[Civ. No. 19781. Second Dist., Div. Three. Jan. 26, 1954.]

N. S. RIDGWAY, JR., Respondent, v. JOSEPH N. CHASE et al., Appellants.

David C. Moore, Stanton, Stanton & Welbourn and Louis B. Stanton for Appellants.

Robert N. Gold and Marco & Harter for Respondent.

VALLÉE, J.—Appeal by defendants from an adverse judgment in an action by a real estate broker to recover a commission.

Plaintiff was a licensed real estate broker and also was a salesman for Consolidated-Hill, Inc., a concern engaged in selling market fixtures.

On January 31, 1949, the parties entered into a written contract[1] by which defendants employed plaintiff "for a period of Sixty (60) days from the date hereof [to and including April 1, 1949], and within ninety (90) days thereafter [to and including June 30, 1949] to parties with whom said Agent negotiated during said period, as my sole and exclusive Leasing Agent to procure a tenant for the exclusive business of operating a Food Market on the premises [description of a 20 acre unimproved parcel of realty owned by defendants] on the following terms and conditions: Percentage lease with guaranteed minimum rental to be approved by Owners." Other conditions prescribed by the contract were that if plaintiff procured a tenant in accordance with the terms of the contract, "or any other terms accepted by me," defendants agreed to pay him a commission, and in the event he received a contract for certain fixtures to be installed in the market. he would not charge a commission.

Plaintiff did not, within 60 days from January 31, 1949, negotiate the leasing of the property with anyone, nor did

[1]The contract reads:

"OWNER'S AUTHORIZATION TO LEASE OR RENT

"To: N. S. Ridgway, Jr., Agent
"Address: 1701 S. Grand Avenue, Los Angeles, California, January 31, 1949
"For and in consideration of services to be rendered by the above named Agent, I hereby employ said Agent for a period of Sixty (60) days from the date hereof, and within ninety (90) days thereafter to parties with whom said Agent negotiated during said period, as my sole and exclusive Leasing Agent to procure a tenant for the exclusive business of operating a Food Market on the premises know____ as The C-2 portion of the South half of Lot 189, Tract 1000, located at N.W. corner of Fulton Avenue & Riverside Drive, Van Nuys, California, on the following terms and conditions:
"Percentage lease with guaranteed minimum rental to be approved by Owners.
"Should said Agent procure a tenant for the premises herein described, in accordance with the terms herein, or any other terms accepted by me, I agree to pay said Agent a commission at the regular rate authorized by the Los Angeles Realty Board, and now in effect, and authorize the said Agent to notify his client of my acceptance upon receiving a written offer from him in conformity with the above agreement.
"It is further understood and agreed that in the event said Agent receives the contract for all the Refrigeration, Fixtures and Equipment (excluding cash registers) to be installed in the Market as herein described, there will be no Real Estate commission charged by said Agent. In the event said Agent does not receive the contract to install the aforementioned fixtures and equipment, I agree to pay said Agent the authorized Real Estate commission.
"Should suit be commenced to collect commission provided for in this agreement, I agree to pay all Attorney's fees and court costs.
"It is further understood and agreed that said Agent may act for other parties and receive compensation therefor."

he thereafter, within 90 days, procure a tenant. On or after April 10th, he commenced discussions with Messrs. Weisstein and Cummings, a copartnership, whom we refer to as the partnership, which continued into July, 1949. Plaintiff told Cummings he was acting for Consolidated-Hill, Inc., in the transaction and that he was going to get a commission on any market fixtures sold to the partnership. Plaintiff introduced the parties. After that he attended several meetings in which defendant Joseph N. Chase, referred to as defendant, and the members of the partnership discussed a lease of the property and what it should contain. Plaintiff testified defendant asked him to attend the meetings "and more or less assist him." At one of the meetings defendant asked the members of the partnership to purchase their fixtures and equipment for a contemplated building on the property from plaintiff, stating that if they did he would not be obligated to pay plaintiff a real estate commission. Plaintiff testified that at another meeting he told defendant he objected because the partnership would not purchase all of the fixtures from him; that he asked defendant if he would pay the real estate commission, and defendant said, "That's all right. I'll take care of this. I understand that. We will pay the commission." Plaintiff also testified that about July 12th he told defendant he was working without any contract, the time on his contract had been used up, and "I haven't really gotten any written contract. What are we going to do about my commission?" that defendant said: "Well, that's all going to be taken care of under the July 14th agreement that we are preparing"; that he (plaintiff) replied: "No, I want my—I want to reinstate my broker's commission here." Plaintiff, at that time had prepared a new "Owner's Authorization to Lease or Rent" which he had signed and which he presented to defendant for his signature since he wanted something new to be signed so as to protect his interest. Defendant did not sign it. Plaintiff did not deny he told defendant he was working without an agreement and that he wanted something new to be signed so as to protect his interest.

On July 14, 1949, as a result of the negotiations, defendants and the partnership entered into a written contract by which they agreed to execute a lease of part of the property only, on specified terms and conditions. Among the terms and conditions were these: 1. By mutual agreement of the parties in writing, the property was to be divided later into

a business area and a parking area. 2. Defendants agreed to construct a market building on a part (150′ x 150′) of the business area with a ground floor storage space, according to plans and specifications to be submitted to the partnership and to be approved in writing later by both parties. No time was fixed for commencement of construction. The document expressly provided that the market building and storage space "shall constitute the portion of the above described real property to be included in the lease, the subject matter of this agreement." 3. Defendants agreed, on or before completion of construction of the market building, to construct store buildings on the entire balance of the business frontage of the business area. The partnership was given the right to approve prospective tenants of the store buildings. 4. Defendants agreed to surface, install adequate lighting, and maintain in good repair, the parking area. No time was set for the doing of this work. The partnership agreed to pay, for maintaining the parking area clean, such proportion of the total cost therefor as the parking area bore to the floor area of the buildings in the business area. 5. "The term of the lease shall be either 15 years or 20 years, at the option of Lessees." The lease was to give the partnership an option to renew. 6. The annual rental, under the lease to be executed, was to be 1¼ per cent of receipts from gross sales up to and including $1,000,000, and 1 per cent of gross sales in excess of $1,000,000, to and including $2,000.000. Defendants represented that they intended to obtain a maximum loan on the property and market building "to be demised" to the partnership, and the latter agreed to pay as a minimum rental a sum equal to the minimum amount to be paid monthly on the loan. "The said lease shall provide" for rental payments to be made monthly in advance. 7. Defendants guaranteed to construct multiple dwellings with not less than 250 apartments on adjacent real property (not part of the 20 acres described in plaintiff's contract of January 31, 1949) and to complete said construction not later than December 30, 1950. 8. The partnership agreed to purchase all the refrigeration equipment and market fixtures to be installed in the demised premises, excluding specified ones, from Consolidated-Hill, Inc. On July 23, 1949, the latter provision was amended. By the amendment, the partnership agreed to purchase from Consolidated-Hill, Inc., not less than $32,500 of its refrigerated display cases to be installed in the demised premises. The amendment was signed

by defendants and the partnership and was "Approved and Accepted: CONSOLIDATED-HILL, INC. By N. S. Ridgway, Jr."

An attorney for defendant, who assisted in preparing the agreements, testified that after the July 14th agreement was executed and before the amendment of July 24th, the partnership insisted on changing the provision of the agreement of July 14th by which it agreed to purchase practically all of the refrigeration equipment and market fixtures from Consolidated-Hill, Inc.; that plaintiff agreed to $32,500; that plaintiff said he wanted to be protected in his compensation; and that nothing was said about real estate broker's commission.

The matters agreed to in the agreement of July 14th were never consummated. The lease contemplated by the agreement was never entered into. No such instrument was ever prepared. The parties never agreed on a division of the property into a business area and a parking area. They never agreed as to the type of construction, or the size or location of the food market. They never came to an agreement as to whether the lease should be for 15 or 20 years. No time for the commencement of the lease was ever agreed upon. Preliminary plans for the market were drawn, but final plans were never drawn. No agreement was ever reached as to any date when the market building was to be constructed. No firm loan commitment was ever obtained. The parties never agreed on a figure as to what the minimum monthly rental would be. It was stipulated "that everything to be approved by the parties in a lease to be subsequently executed has never been done." Plaintiff did not procure a tenant on the terms specified in the contract of January 31, 1949, or on any other terms.

Cummings testified that he and his partners, on many occasions after July 14th, told defendant they were ready, willing, and able to enter into a lease in accordance with the terms of the agreement of that date. However, the members of the partnership changed their minds several times with respect to the size of the building. The estimated cost ran from $180,000 to $240,000. Defendant completed the construction of the multiple dwellings on the adjacent property prior to December 30, 1950. At the time the agreement of July 14th was executed, the property was encumbered with a $35,000 deed of trust. In connection with the construction of the dwellings on the adjacent property, defendant further encumbered the property to the extent of about

$64,000. The $35,000 encumbrance was removed in June, 1951. At the time of trial, the $64,000 encumbrance had been reduced to $15,000.

In December, 1950, plaintiff informed defendant that he was no longer connected with Consolidated-Hill, Inc.; that the sole consideration for his efforts was the purchase of the equipment from Consolidated-Hill; that he was still in the negotiations and should be protected, and asked for some sort of listing to protect himself. No listing was given.

Defendant testified that in December, 1950, he was ready to go ahead with the construction of the market building; that he then had a tentative commitment of $200,000. On February 2, 1951, he made application to the National Production Authority for permission to purchase materials to construct the food market. The application was denied.

On June 26, 1951, defendant advised the partnership that "due to practical and legal reasons it has been, and is impossible" to enter into such a lease as was contemplated by the partnership.

The court found: "[P]laintiff broker had fully performed his contract and was entitled to its benefits." "[T]he defendants waived the provisions of the broker's contract of January 31, 1949, pertaining to the time within which the lease was to be executed." The proposed lessees, at all times since July 14, 1949, have been ready, willing, and able to execute the lease. Defendants have refused, without cause, to enter into a lease in accordance with the agreement of July 14, 1949. The court concluded: "A broker employed to obtain a lessee upon terms of 'percentage lease with guaranteed minimum rental to be approved by owners or any other terms accepted by owner' has performed his agreement when he procures a lessee ready, willing and able to execute a lease in accordance with the terms required but is prevented from executing the lease by the refusal of the lessor. . . . A principal who accepts a proposed lessee after the time fixed in the broker's contract for the procurement or negotiation of lease, and himself negotiates with the proposed lessee and enters into an agreement with him, waives the restriction of time fixed in the broker's contract unless he informs the broker before he enters into negotiations that he will not accept the proposed lessee as the result of the broker's procurement." Judgment for plaintiff followed. Defendants appeal.

Plaintiff's position is that the agreement to lease of July

14, 1949, constituted performance by him of the contract of January 31, 1949. Defendants claim that under the terms of the contract of January 31, 1949, plaintiff was to procure a lease of the 20 acres; that not having done so, he is not entitled to recover.

Plaintiff's contract was special, not general. He was employed as defendants' "Leasing Agent" to procure a tenant for the exclusive business of operating a food market on the 20 acres under a percentage lease, with a guaranteed minimum rental to be approved by defendants. If he procured a tenant on any other terms, they were to be accepted by defendants. His contract was not to procure a person ready, willing, and able to enter into a lease; it was to procure a lease. His compensation was dependent on his procuring a lease. (See *Peterson* v. *Montgomery Holding Co.*, 89 Cal. App.2d 890 [202 P.2d 365].)

■ The right of a broker to recover a commission must be measured by the terms of his contract. (*McGill* v. *Fleming*, 32 Cal.App.2d 601, 604 [90 P.2d 341]; *Denbo* v. *Weston Inv. Co.*, 112 Cal.App.2d 153, 157 [245 P.2d 650].) ■ A broker may, by special agreement, make his commission dependent upon a contingency or the happening of a condition precedent, and unless such contingency occurs or such condition happens, he has no right of recovery. (*Denbo* v. *Weston Inv. Co.*, 112 Cal.App.2d 153, 157 [245 P.2d 650].)

■ The general rule is that unless the failure to secure a lessee on terms proposed and within the time provided is due to negligence, fraud, or fault of the owner, a broker may not recover on his contract. (*Ford* v. *Palisades Corp.*, 101 Cal.App.2d 491, 497 [225 P.2d 545].) ■ "Where the time for performance is definitely fixed by the contract, the transaction must be completed within that designated time to entitle the broker to his commissions. In 2 Mechem on Agency, page 2026, section 2439, it is said in that regard: 'It is also indispensable that the purchaser should be found within the time limited, for if the broker's exertions do not produce the buyer until after that time has expired, it is not enough, even though that buyer may subsequently become the purchaser, unless the principal has caused the delay, or unless he waives it.' " (*Heffernan* v. *Merrill Estate Co.*, 77 Cal.App.2d 106, 115 [174 P.2d 710].) ■ If a broker does anything less than, or different from, what is designated in his contract, he is not entitled to a commission.

(*Merkeley* v. *Fisk*, 179 Cal. 748, 756 [178 P. 945].) The acceptance of the owner's offer to lease must be unconditional to entitle a broker to a commission. (*Edwards* v. *Billow*, 31 Cal.2d 350, 358-361 [188 P.2d 748] ; *Love* v. *Gulyas*, 87 Cal.App.2d 608, 615 [197 P.2d 405].)

 *Howard* v. *Burrow*, 77 Cal.App. 4 [245 P. 808], is determinative of the case. The contract in that case, dated March 28, 1944, was "to obtain a tenant on a five year lease. . . . This contract to remain in force for ten days from date." Within the 10 days the broker introduced a prospective lessee to the principal. A discussion was had between the principal and the prospective lessee regarding the lease, but no agreement was reached at that time, nor on or prior to April 7, 1924, the end of the term of the broker's contract. On April 9, 1924, the principal and the prospective lessee executed an unenforceable agreement to lease. The broker was present at the discussion leading to the execution of the unenforceable agreement. No lease was ever executed. The court held (p. 7) : "If we assume, for the purpose of this case, that such is the fact and that said paper [of April 9, 1924] was an agreement, it will be noted that that paper was executed two days after the respondent's contract had expired. Such being the fact the respondent could not recover under his contract. . . .

"In what we have said above, we assumed that the writing dated April 9, 1924, was a valid enforceable contract. Under the settled law of this state and of many other states we went too far in making that assumption. The Campe Company was to make the alterations and improvements. The plans and specifications had not been prepared. When they were prepared it is manifest that they should be prepared by, and to the satisfaction of, the Campe Company. By the clear language of the written instrument dated April 9, 1924, they were also to be approved by Mr. Burrow. There was, therefore, a material element in the writing on which the minds of the parties had not met. However, it was of the very essence of the respondent's contract that he should bring the parties to an agreement. (*Ayres* v. *Thomas*, 116 Cal. 140, 144 [47 Pac. 1013].) There is a long line of cases in this state holding that writings in such form are incomplete and not enforceable as executory contracts to enter into a lease. (*Morrison* v. *Rossignol*, 5 Cal. 64, 65; *Stanton* v. *Singleton*, 126 Cal. 657, 664 [47 L.R.A. 334, 59 Pac. 146] ; *Wineburgh* v. *Gay*, 27 Cal.App. 603, 605 [150 Pac. 1003] ;

*Durst* v. *Jolly,* 35 Cal.App. 184, 189 [169 Pac. 449].) And the same rule has been applied to executory contracts of sale. (*Klein* v. *Markarian,* 175 Cal. 37, 40, 41 [165 Pac. 3].) Speaking of the rule in general, in Williston on Contracts, section 45, the author says: 'Although a promise may be sufficiently definite when it contains an option given to the promisor or promisee, yet if something is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Since neither party by the very terms of the promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise. It should be observed, however, that though such a promise is invalid, it will not necessarily invalidate an entire agreement of which it forms a part.' A leading case in New York is a parallel case. (*Mayer* v. *McCreery,* 119 N.Y. 434 [23 N.E. 1045].) In that case Mr. Justice Peckham, speaking for the court, said: 'It is in substance an agreement that, *if the parties shall thereafter agree upon plans for the alteration of the building,* that thereupon a lease of the building upon the terms specified in the letters will be given by the defendant to the plaintiff.'' (See also *Peterson* v. *Montgomery Holding Co.,* 89 Cal.App.2d 890, 893-894 ·[202 P.2d 365]; ·*Pohl* v. *Mercurio,* 93 Cal.App.2d 236, 239 [208 P.2d 1020]; *Ellis* v. *Klaff,* 96 Cal.App.2d 471, 478 [216 P.2d 15]; *Kerr Glass Corp.* v. *Elizabeth Arden Corp.,* 61 Cal. App.2d 55 [141 P.2d 938]; *Klein* v̇. *Markarian,* 175 Cal. 37, 40-41 [165 P. 3].)

In *McGill* v. *Fleming,* 32 Cal.App.2d 601, this court stated (p. 604 [90 P.2d 341]): "The trial court properly concluded that the parties contemplated the payment of the brokers' commissions only upon the effective consummation of the leases. We are not unmindful of the general rule that a broker earns his commission when he has secured an acceptable lessee for the lessor, one who is ready, able and willing to lease the property upon the terms on which the broker is authorized to negotiate the lease. The present case, however, is not the ordinary one in which a broker is employed to secure a lessee in the open market. In this case the prospective lessee was named in the form of lease which had been prepared and also in the agreement sued upon. In this agreement the lessor became bound to pay the commission 'for consummating' the transaction. The right of the broker to recover commissions must of course depend upon the terms

of his employment. The word 'consummate' means to bring to completion. (*Connor* v. *Riggins,* 21 Cal.App. 756 [132 Pac. 849].) In order to consummate the transaction it was necessary that a binding and valid lease be secured, one which bound the lessee to comply with definite terms agreed upon by the parties. It is not reasonable to construe the words 'for consummating the lease' as referring to the signing of the lease forms which had already been drawn up, for those documents were not binding upon either defendant or the company.

"It will be noted that in the so-called leases the lessor purports to lease *a building,* one which was not then in existence. The floor plan and specifications were to be mutually agreed upon between the parties and approved in writing within thirty days, otherwise either party could be relieved from all obligations. The plans and specifications were naturally of great importance to defendant, since they might require a greater or lesser expenditure of funds in the erection of the building. Obviously they were also of importance to the company. Plaintiff's contention that he became entitled to his commissions upon the signing of the forms of leases does violence to a reasonable construction of the language used in the agreement, particularly in view of the circumstances surrounding the transaction. If the commission became due upon the signing of the instruments in question there would have been no need for employing the language 'for consummating' the leases and for requiring that the payment of the commissions be made after the erection of the buildings.

"In *Leventritt* v. *Cowell,* 21 Cal.App. 597 [132 Pac. 627], the factual situation was very similar to that of the case under review. The litigation there involved 'a contract for a lease to be executed in the future, and in which the lessees had not fully agreed to the terms of the lease, for the contract provided that the plans and specifications for the buildings were yet to be approved and ''O.K.'d'' by the lessees.' It was held that the broker could not recover. (See also *Ball* v. *California Conserving Co.,* 189 Cal. 326 [207 Pac. 1011]; *Allison* v. *Chapman,* 36 Cal.App. 759, 760 [173 Pac. 389]; *Peak* v. *Jurgens,* 5 Cal.App.2d 573, 576 [43 Pac.2d 569].)"

■ The cases which hold that where a broker produces a person who is ready, willing, and able to consummate a lease he has earned his commission, are not in point. That rule does not apply where the acceptance by the owner is

conditional. (*Edwards* v. *Billow*, 31 Cal.2d 350, 359-360 [188 P.2d 748].) "The general rule is that an agent performs his part of such a contract when he produces a purchaser able, ready, and willing to buy upon the terms specified by the owner. Upon a general contract of employment, certainly, the owner may make concessions to a purchaser without loss of the commission to the broker, but there is a distinction in fact recognized by the authorities, between a general and special contract of employment in a matter of this kind. It appears that where the broker has undertaken a special task by his contract of employment and fails to perform it, the fact of having first introduced the buyer and seller will not entitle him to recover." (*Backman* v. *Guadalupe Realty Co.*, 78 Cal.App. 347, 352 [248 P. 296]. See, also, 12 C.J.S. 198, § 86c.) Defendant did not unconditionally accept the proposed lessee. There was no unqualified legally binding agreement to lease.

Plaintiff claims that defendants waived the limitation of time fixed by his contract. ■ The rule of extension of a broker's contract is dependent on a waiver. (*Love* v. *Gulyas*, 87 Cal.App.2d 608, 615 [197 P.2d 405].) The time for performance specified in a broker's contract may be waived by the principal where he, after the time limit has expired, urges and encourages the broker to continue his efforts, and the broker does so continue with the knowledge, approval, and encouragement of the principal; and, as a result of the broker's efforts, the purpose of his employment is effected. (*Baker* v. *Curtis*, 105 Cal.App.2d 663, 669 [234 P.2d 153].) ■ The contract of January 31, 1949, by its very terms, terminated on April 1st. Plaintiff did not negotiate with anyone within that time. He claims that because he found the partnership and defendant permitted him to negotiate with its members until July 14th, when the so-called agreement to lease was executed, the contract period was extended until July 14th. The acts of the parties did not constitute an extension of the contract period. They merely constituted what might have been an extension of time by defendant had a lease with the partnership been executed. If defendants were waiving the time, they were doing so only on the condition that a lease with the partnership eventuated. (See, *Love* v. *Gulyas*, 87 Cal.App.2d 608, 618 [197 P.2d 405].) ■ We should comment that the finding that defendants waived the provisions of the contract of January 31, 1949, pertaining to the time within which the lease was to be exe-

cuted, is a misplaced conclusion of law. No facts were found on which such a conclusion could be predicated. The conclusion as to when a principal waives the restriction of time fixed in a broker's contract is not a correct statement of the law. (See *Ford* v. *Palisades Corp.*, 101 Cal.App.2d 491 [225 P.2d 545] ; *Baker* v. *Curtis,* 105 Cal.App.2d 663 [234 P.2d 153].)

We hold that the finding to the effect that the contract of employment as broker was fulfilled is not supported by the evidence. (*Cf. Kritt* v. *Athens Hills Dev. Co.,* 109 Cal. App.2d 642, 646 [241 P.2d 606].)

Reversed.

Shinn, P. J., and Wood (Parker), J., concurred.