[Civ. No. 15450. · First Dist., Div. One. Dec. 24, 1952.]

ROSINA CRISCI, Plaintiff and Respondent; EGIDIO BIANCHI et al., Cross-Defendants and Respondents, v. JOSEPH SORCI et al., Appellants.

JOSEPH CRISCI et al., Appellants, v. ROSINA CRISCI et al., Respondents.

Morris Grupp and Richard M. Siegel for Appellants.

· J. A. Pardini, Elda Granelli and F. Campagnoli for Respondents.

BRAY, J.—Joseph and Marie Sorci appeal from portions of judgments quieting title against them.

## RECORD

██ The sole question presented is the sufficiency of the evidence, based primarily upon the claim that Rosina's testimony is inherently improbable. Joseph Sorci, also known as Joseph Crisci, is the son of Rosina Crisci. Marie Sorci is his wife. Two actions to quiet title were tried together. One was brought by Rosina against Joe and Marie, the other by Joe and Marie against Rosina and the Bianchis who were purchasers from Rosina of one of the parcels. Cross-complaints were filed by the parties against each other. The gist of Joe's claim* is that Rosina holds title to three parcels of property, the purchase price of the property sold to the Bianchis, and the rents and profits on all four parcels, in trust for him. Rosina claimed title in herself. There is a boxful of exhibits and an 1893-page transcript of testimony. The court quieted Joe's title to one parcel, Bianchis' title to the parcel claimed by them, Rosina's title to three parcels and denied Joe's claim as to the purchase price of the property sold to Bianchis and to any rents and profits. Joe appeals from the portions of the judgments quieting title to the three parcels in Rosina, and denying an accounting of the moneys received by Rosina from the sale to Bianchis and the rents and profits on all the properties. There is no appeal from the portions quieting title in Joe to the one parcel, nor quieting title in the Bianchis.

## EVIDENCE

Joe testified that it was his money which purchased the properties; that he put the title in the first acquired parcel in Rosina's name to avoid possible execution thereon by his first wife, Anna, for unpaid child support. Rosina denied this and claimed her money bought the properties. Most of the evidence was that of the mother and son. The testimony of each contains contradictions, discrepancies, and in some respects is not supported by the written documents. However, the trial court believed Rosina. Under the well known conflict of evidence rule it was its duty to reconcile these contradictions and inconsistencies, if it could. We are bound by its findings, unless, as claimed, Rosina's testimony is inherently improbable. Also, we have to consider the evidence, and the reasonable inferences therefrom most strongly in favor of Rosina. Rosina is approximately 59 years of age, semiliterate, thrifty,

---

*As Marie did not testify and was joined as a party merely because of her marital relationship, reference generally will be made to Joe alone.

active and acquisitive, and fairly capable in business. Joe, now approximately 40 years of age, is her son by her first marriage and now her sole child. A daughter "disappeared" many years ago. Rosina came to this country prior to the first World War. Joe is apparently a jack of all trades, and unless the money which purchased the property was his (contrary to the finding of the court), not too successful at any of them. Rosina speaks broken English, and has been greatly dependent upon Joe to interpret for her. Mother and son were very close. He lived with her most of the time. He has been married three times. The first two marriages did not last long, and apparently were broken up by Rosina. She objected to the last marriage, that to defendant Marie. Joe charges the controversy between Rosina and him to this marriage and to his refusal to separate from Marie. Rosina's first husband and Joe's father died in 1915. She worked in a San Jose cannery and then in a San Francisco tailor shop. In 1917 she married Giovanni Crisci, her husband at the time of the trial. (He has since died.) At the time of marriage he had $10,000 and thereafter made money as a fisherman, between 1917 and 1937 making sometimes $40 and $50 per week. She continued to work in a tailor shop. In 1922 Giovanni bought two flats on Mason Street for about $6,000. The property was later changed from his name to his and hers. In 1947 they sold the property for $15,000, Rosina handling the transaction. In 1931 she bought a lot on Chenery Street for $1,000. With $9,000 cash she built a home on it. The house burned in 1937, and she got $1,700 from the insurance company. In 1935 she bought a lot at 317 Chenery Street for $1,124, taking title in her maiden name. She built two flats on it, financed by a loan of $6,000. This property was redeemed at tax sales by both mother and son at times. The court quieted title in the son to this property. Rosina did not appeal. In 1935 Rosina had a dress shop and a dressmaking shop. She claimed to have made a little money in these shops.

Joe is a licensed master electrician. He was a general contractor from 1935 until 1940. From 1940 to 1943 he worked nights as a longshoreman. He was injured in 1943. He worked in the grocery store at night, and in remodeling the building at 2100 Jones in the daytime. During 1949 he had a store which his wife ran. He also is a locksmith and at one time had a restaurant and another an electrical business which had four or five different locations. He has four automobiles. Why, does not appear. Rosina had a

savings bank account in 1922-1923 and small bank accounts in 1933 and 1936. Other than these, she had no bank accounts. Joe had bank accounts during most of the period involved, but he could trace none of the moneys going into the properties (other than two small amounts hereafter mentioned). As said in appellant's opening brief, ''Each member of this family lays claim to having had a great deal of money which never saw a bank.'' With this background we come to the various properties involved. The first parcel to be purchased and the one which is the primary basis of Joe's claim is

### 801 FILBERT STREET.

It was purchased in 1936 for $7,250 from the estate of a deceased person and the guardian of his minor children. The deeds dated March 27 were made to Rosina and bear revenue stamps. On April 23 Rosina and Giovanni executed a deed to Joe. This deed does not bear stamps. The three deeds were deposited in the same escrow and all recorded May 1. The purchase price was paid as follows: $5,000 borrowed from the Bank of America on a note secured by a deed of trust on the property, note and deed of trust signed by Rosina and Joe (January 9, 1937, this loan was renewed by a new deed of trust for $8,250. The note was signed by Joe as maker and Rosina as endorser.) Rosina assumed this loan February 8, 1938. Again on December 21, 1939, a $9,400 deed of trust was placed on the property. One thousand dollars was evidenced by a promissory note in that sum executed by Joe to one of the children of the deceased. This note was later paid by applying a $1,000 judgment which Joe had secured against one Gianfranchesci. Seven hundred and twenty-five dollars was in cash deposited with the attorney for the estate. Six hundred and twenty-five dollars was a cashier's check of the Clay-Montgomery Branch of the Bank of America where the son had an account and where the mother had no account. Sixty-four dollars and fifty cents was a personal check on the Mission branch of that bank. As the mother had no account in that bank and Joe did, it is obvious that this must have been Joe's check. Monthly payments were required to be made on the deeds of trust. Only two payments can be traced. July 20 and August 3, 1936, the son's checks in the sum of $64.60 and $64.40 respectively made payments. Some of the later payments were in cash. Due to destruction by the bank of records, payments by check cannot be traced. Rosina testified that

she advanced all the money for all the payments; that she gave Joe $60 per month to pay off the $1,000 note but instead of making payments on it he kept the money. She also testified that she paid $100 per month on the $9,400 loan. Joe claimed that he paid for the property. January 5, 1938, almost two years after the acquisition of the property, Joe deeded the property to his mother. The deed bore $1.50 in revenue stamps. That same year the property was sold to the state for delinquent taxes. In November Rosina redeemed it. October 15, she deeded an undivided one-half interest to Giovanni.

In November, 1932, Joe's first wife, Anna, obtained an order in her divorce action of $20 per month for support of their child. Joe was jailed one or two times for nonsupport. Joe testified that the title to the property was originally taken in the mother's name to prevent Anna from levying on it. Then he felt in danger of subjecting his property to Giovanni's marital rights so he had them sign the deed to him. Two years later he claims he heard that Anna was threatening to proceed against him so he transferred the property to his mother. Anna took out execution on the day prior to the date of the deed from Joe to Rosina. On the other hand, the mother testified that she was going to the hospital for a serious operation (removal of a kidney) and she told Joe she would give him the property "if I die," but if she came back from the hospital she would want it back again. The deed, however, was not executed until her return from the hospital. There was some contradiction in her testimony as to when she thought she made the deed and as to when she felt well and when she was worried about her health. She testified positively that the deed was executed to Joe on the condition that the property was to be given back if she got better.

Joe's claim that he placed the title originally in Rosina's name to prevent levy by Anna is open to considerable question. The amount due was comparatively small, $20 per month for about four years. Again Joe had and thereafter maintained several bank accounts in his own name. Why he would cover up his claimed interest in real property and yet leave bank accounts open to levy does not appear. Moreover, although on purchase of the property it was deeded to Rosina, before the purchase escrow was closed and any deeds recorded it was deeded to him and remained in his name for approximately two years. That hardly indicates any fear of levy by

Anna. He testified that at this time she had gone back east and he did not know where she was. There is no evidence that she had threatened enforcement of the order. The evidence shows that between 1936 and 1938 Joe was repairing the property. The money apparently came from funds loaned by the bank. Nothing had been finished at the time of the deed from Joe to Rosina. There were many mechanic's liens against the property and judgments against Joe on them. The property was in bad physical and financial condition. Rosina had repeatedly asked him to reconvey the property as agreed. He had paid nothing on the $1,000 note although she had given him $60 per month to pay on it. Rosina had hired Attorney Cosgrove to settle all the liens. Joe was about to be married. It was under these circumstances that Rosina insisted that Joe reconvey the property as agreed.

Joe places great reliance on the fact that he put revenue stamps on the deed and that in the first transfer from Rosina and Giovanni to Joe no stamps were placed on the deed. He contends that the purpose of the stamps was to indicate to Anna that a consideration had passed from Rosina to him for the property. While the presence of the stamps is subject to that interpretation, it does not compel the conclusion that his story of the transaction is true and Rosina's untrue. It is significant that when Rosina deeded half the property to her husband Joe took her to the notary to acknowledge the deed and made no objection to the transfer.

Tony Cefalu, Rosina's brother, testified that Rosina had told him that Joe was a good boy, he had "assigned" two apartments to her; also that she had said Joe bought her another property because he did not want to give any money to his first wife.

There is evidence that from May to December, 1937, the rentals were paid by the realtor to Joe and that Joe gave the real estate agent $35 for taxes. Rosina testified that she received all the rents and paid on the deed of trust from them and from other moneys; that both she and her husband from time to time gave Joe moneys to be used on the remodeling of the property as well as the moneys borrowed from the bank. Rosina paid all the real and personal taxes and insurance, although in many instances the payments were physically made by Joe with moneys given him by Rosina. The bank records show that on February 8, 1938, she assumed the then indebtedness. During the existence of the O.P.A. there was "trouble in court" and with the O.P.A. Rosina hired lawyers.

Joe went with her to talk because of her language difficulties. Throughout the handling of her properties Joe did the talking for her and in many instances acted, at her request, in her absence. Mother and son were very friendly and she trusted Joe, although she claims that in many instances he did not use the moneys she gave him for the purposes intended. Rosina signed the store lease on the property, paid for gas and electricity. At first Joe testified that his mother was not sick at the time of the deed to him; then he testified he did not remember if she was; finally he remembered her being in the hospital. He testified that he had given his blood for a transfusion for her. Then on being reminded that tests showed his blood was the wrong type, he admitted he had not and "this woman did."

While there are many inconsistencies and contradictions in Rosina's testimony (much of it can be attributed to the language difficulty) there are equally as many, if not more, in Joe's testimony. Joe was an evasive witness. Moreover he indicated that he enjoyed violating the law. On one occasion when he detailed how he acted in the electrical business the court commented, "You flaunted the law all the way along the line, didn't you?"

Joe's testimony concerning his earnings is quite unsatisfactory. As to profits of the business (grocery and chicken) he and his mother were conducting together, splitting the profits, he first testified that in the period 1943-1945 the profit was $1,000 per month; later he changed it to $1,000 to $2,000. In the period 1945-1947 he gave different versions of the weekly profits—it was $500, $600 and $700, $100 per week, then suddenly after 1947 there were no profits. Actually this business was bought in June, 1945, and sold in October.

Joe accounted for a $1,500 deposit in one of his bank accounts by saying it came from a plumbing job he did for Fung and Poo; then he testified it came not from these two but from different jobs including theirs. A few days later he testified that his mother gave him the $1,500. This source was corroborated by Rosina and her sister. He testified at some length about the moneys he made in the years 1935 to 1940; then that he did not earn enough in those years to file income tax reports. He kept no books or records.

The record shows that Joe's attitude on the witness stand at times was not too convincing. Sometimes he was evasive, sometimes belligerent, and sometimes insolent. He admitted signing an affidavit for a final decree of divorce in which

he stated he had complied with the terms of the interlocutory decree, when he had not paid the support therein ordered for his child. He admitted he did not file any income tax reports from 1935-1940 because he wanted to evade payment of income taxes and the reports he did file, says his counsel, "like those of the other parties to this action . . . may be mistrusted." In none of his reports did he give any intimation that he had any interest in these properties. Joe was contradicted by several witnesses concerning a sale of a poultry store and lease by Joe.

Appellant contends that the following facts make the mother's story that her money was used to purchase the property inherently improbable: 1. The renewal of the $5,000 note was made by Joe as maker with Rosina as a guarantor only. (At this time the title was in Joe.) 2. The $1,000 note was signed by Joe alone and paid by him. 3. The only two payments on the $5,000 note which can be traced from any bank account came from Joe's bank account. (Many bank records of both parties were not available. Both parties agree that rentals were used in making monthly payments on the deeds of trust.) 4. The $625 cashier's check came from a branch in which the son had an account and the mother did not. 5. Presence of revenue stamps on the deed from the son to the mother when there were none on the deed from mother to son. 6. Anna took out execution the day before the deed from Joe to Rosina.

While these facts are persuasive, they do not make the mother's testimony inherently improbable nor necessarily inconsistent with all of the facts in the case.

### 745 COLUMBUS AVENUE

This is the property which Rosina sold to the Bianchis. The court found that they purchased the property in good faith for value, and quieted their title to it. This finding is not challenged on this appeal. Appellant contends, however, that he was the owner and therefore is entitled to the proceeds of the sale and to an accounting by Rosina of the rents and profits. Rosina testified that the owner, Landucci, had offered to sell it to her about February 21, 1942. She gave him a check as a deposit. Before cashing it, Landucci died. His son returned her the check. She sent Joe to the office of Dreher, the attorney for the estate, with the money to pay a deposit, and she had Joe take care of all matters in connection with the escrow. Joe brought back the re-

ceipt made in her name. Dreher testified that Joe told him that his mother was buying the property. One of the heirs of the estate told Dreher to sell it to Rosina in place of another offerer. Dreher wrote letters to Rosina, not to Joe, concerning the payment of the balance of the purchase price. The purchase price and expenses of sale came to $5,063.99, of which $3,000 was secured by a deed of trust. Both parties claim that they paid the difference. No bank records were produced. Rosina testified that at the time, she had $16,000 either in her safe deposit box or at home and that the payments came from that source. The payments were made after threatening letters from Dreher as follows: $1,200 January 29, 1942; $200 February 16, and $163.99 February 20. Rosina testified that on the day of the confirmation of the sale she gave Joe $500 to pay into court. No sum was paid into court nor was there any $500 payment made. These facts are not so inconsistent with her having a large sum of money on hand that we can say the trial court must necessarily disbelieve her. A representative of the title company testified that Rosina ordered the title search. His records indicate that she put up the money. About a year after the purchase Joe opened a small grocery store there, transferring the stock from 801 Filbert. He ran it from 1943 to 1949. He received the profits, and the licenses were in his name. Rosina and her husband worked in the store and Joe paid her wages. He paid no rent although he had agreed to pay his mother rent. The bookkeeper to whom Joe had taken his mother to have her income tax reports prepared told her she would have to put the $30 per month rental in the report even though she did not receive it. Apparently Joe lost money, for he abandoned it in 1949 whereupon Rosina reopened it. Mrs. Sacculo, Rosina's sister, testified that she helped Rosina run the store in the fall of 1949. She helped Rosina stock the store and kept the books. Joe asked Rosina for money to pay for paint on "the apartment." Rosina asked him when he would finish the work on the apartment and he said when "you give me more money." He then told Rosina that he "quit" and that she could get someone else to do the work for her. On one occasion after suit was started Joe told her in effect that he could not wait for the property until his mother died, he needed it now. Nor in his talks with her did he ever make any claim to the property involved until after suit was filed.

## 949 Filbert and 2100 Jones

949 Filbert was bought in November, 1945, from Fogliotti, who was well known to Rosina. She was the grantee in the deed. The purchase price was $25,000. The down payment was by cashier's check for $2,000 and $500 cash. The balance was secured by deed of trust executed by Rosina and husband and covering four properties. Rosina testified she handled the purchase by herself. Prior to this time Rosina had loaned a cousin $9,000 secured by mortgage. This loan and the down payment on the Filbert Street property came from savings Rosina and her husband had accumulated, $9,000 of which was in her safe deposit box and $2,500 at home.

April 29, 1946, 2100 Jones Street was purchased. The record purchase price was $20,000 but the seller required payment of a secret additional $6,000.* Joe was present when this $6,000 was paid and wrote out a receipt for it in his mother's name which was signed by the seller. Rosina testified the $6,000 came from payments received by her from the $9,000 loan and from rents. She received $600 per month from rents. Rosina testified that the payment was wholly made with her money. Joe testified half was her money and half his, which he took from his safe deposit box. Joe claims that he is entitled to a one-half interest in 2100 Jones. As in the other properties, Rosina collected all the rents and paid all the taxes, paid for and obtained in her own name all insurance and permits for operating an apartment house, and did the janitor work. Rental notices were in her name. In court ejectment and in O.P.A. proceedings, in Joe's presence, she testified that she was the owner. She received and answered tenants' complaints. She was named as lessor in leases of the stores in the building, and in Joe's presence told the lawyer preparing one of the leases that she was the owner. She employed attorneys in suits brought by her against tenants. Two of the attorneys in these actions testified that although Joe was a witness he did not claim to have any interest in the property. Joe testified that $3,500 was borrowed on the property for the purpose of remodeling; that Rosina agreed to allow him to take $100 per month for his work on the building ''out of the construction money'' to pay the rent where he was living.

Generally, Joe made the arrangements for title insurance

---

*There is some confusion between Rosina's and Joe's testimony as to whether the exact amount was $6,500, $6,000 or $5,700.

and for the purchase of the various properties, was present at conferences of Rosina with the attorneys preparing eviction notices, at O.P.A. hearings, collected some rentals, served eviction notices, physically made payments for her. Rosina purchased two properties other than those hereinbefore mentioned, 467 Chenery Street and 1851 Mason Street. On the first a house was built but apparently Joe had no part in building it, nor did he appear to assist Rosina in the management, collection of rents or sale of these properties, although he lived in each with Rosina. Appellant argues that the fact that he had practically nothing to do with these properties, to the proceeds of the sale of which he makes no claim, and did have considerable to do with the other properties, proves that he had an interest in the latter. This, like most of the contentions made by him on this appeal, would be persuasive to the trier of fact but not conclusive. While much of the evidence in the case is not inconsistent with appellant's claim, it likewise is consistent with Rosina's claim that, while Joe assisted her greatly, partially because of the necessity for him to do her talking for her, the money he used was actually hers.

The record supports the trial court's conclusion that even though some of the money for the purchase of the 801 Filbert property may have actually been paid from Joe's bank account the moneys were actually Rosina's, that a mother-son relationship existed in which the son was assisting her in acquiring and improving property; that on the whole the mother was a shrewd businesswoman while he was not a shrewd businessman; that he was in one business after another, not making a success of any, and therefore unable to acquire the moneys to purchase the properties (he worked nights as a longshoreman from 1940 to 1943, and then in 1949, but under his own testimony was looking for easy work, what he described as "the gravy boat"); that while he had some ability as a contractor he did not pay the liens arising from the work done by him; that while Rosina was in error in some respects as to the time and place when she made payments, her testimony on the whole was more reliable than Joe's. The record supports the inference that the bank loans which were obtained were due to Rosina's credit standing. The banker who handled them died before the trial and hence his testimony was not available. Rosina had many dealings with banks in her neighborhood, borrowing large sums on unsecured as well as secured notes, and as occasional guarantor of Joe in his

many enterprises. In view of her frugality, hard work, income of herself and her husband, we cannot say, in spite of some difficulty in reconciling figures in the case, that she could not have had the moneys which she testified went into the various properties. Apparently tenant trouble which developed at 801 Filbert and 2100 Jones was due to Joe's failure to finish repairs which he started and for which Rosina gave him moneys.

This case is one to which the conflict of evidence rule well applies. The trial court, which observed the actions of the parties on the stand and in court, is far better able to reconcile the contradictions and discrepancies in the testimony of both parties and to resolve the conflict between them, than can we from the cold record of many pages of transcript and many exhibits.

The judgments are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied January 23, 1953, and appellants' petition for a hearing by the Supreme Court was denied February 19, 1953.