[Civ. No. 23410.   Second Dist., Div. One.   Feb. 10, 1959.]

LIONEL HAYES UHLMANN, JR., et al., Appellants, v. NORTH WHITTIER HIGHLANDS, INC. (a Corporation), Respondent.

Max Fink, Cyrus Levinthal, Emmet G. Lavery, Jr., and Howard L. Thaler for Appellants.

Fleming, Robbins & Tinsman, C. S. Tinsman and Clay Robbins for Respondent.

LILLIE, J.—This is an appeal from a judgment in defendant's favor arising out of an action to recover a broker's commission based upon full performance of an oral contract; or, in the alternative, the reasonable value of services rendered on the theory that full performance was prevented by defendants.

On pretrial, the parties entered into a written stipulation wherein they agreed, among other things, that plaintiff Burke (a licensed real estate broker) was employed in March, 1955, by defendant North Whittier Highlands, Inc. to obtain Shopping Bag Food Stores as a lessee for a market to be constructed on defendant's property "on terms and conditions satisfactory to the defendant, North Whittier Highlands, Inc."; that defendant Shapiro, its president (a licensed contractor), handled the negotiations and discussions on behalf of the corporation; that it was understood between the corporation and Burke that if a lease with Shopping Bag Food Stores was obtained "on terms and conditions satisfactory to North Whittier Highlands, Inc." it would be obligated to pay a broker's commission for securing the same.

At the conclusion of plaintiffs' case, the trial court granted a nonsuit as to defendant Shapiro and, after further admission of evidence, rendered judgment for North Whittier Highlands, Inc. It found there was no meeting of the minds on the terms of a lease or type of building to be constructed; no lease was entered into or executed between defendant and Shopping Bag Food Stores; plaintiffs did not perform their undertaking to procure Shopping Bag Food Stores as a lessee for the market to be constructed on terms and conditions satisfactory to defendant; plaintiffs earned no commission; and defendant did not prevent or frustrate performance by plaintiffs and did not, without cause, fail to consummate and withdraw from the lease arrangement.

Although there is sharp conflict on many points raised in the testimony, in construing the evidence most strongly in favor of respondent (*Crisci* v. *Sorci*, 115 Cal.App.2d 76 [251 P.2d 383]; *Monastero* v. *Los Angeles Transit Co.*, 131 Cal. App.2d 156 [280 P.2d 187]), the following is a fair summary of the facts pertinent to the issues raised herein.

In March, 1955, North Whittier Highlands, Inc. (hereinafter referred to as defendant), under an oral contract, employed Burke, now deceased, to obtain Shopping Bag Food Stores as a lessee for a market to be constructed by defendant on certain of its real property on "terms and conditions satisfactory to the defendant, North Whittier Highlands, Inc.," on a lease on "terms and conditions satisfactory" to defendant. Shortly thereafter, with defendant's consent, and at the insistence of Mr. Hayden, President of Shopping Bag, Burke associated plaintiff Uhlmann to assist him in the negotiations. Uhlmann was familiar with Shopping Bag's needs, having already conferred with Hayden and taken him to inspect the location, and having discussed the "kind of deal" Shopping Bag would make with defendant. Hayden offered $26,400 minimum rental on a building to be constructed by defendant and told Uhlmann this was "absolute top."

Following negotiations between plaintiffs and Hayden, defendant, on March 30, 1955, submitted to Shopping Bag a written offer (Exhibit 5) for the lease of a building to be constructed by defendant, which offer referred to defendant's pending zoning application. Hayden rejected it as wholly unsatisfactory and admonished Uhlmann for bringing it to him.

On April 14, 1955, defendant submitted a second written offer of lease (Exhibit 2) based on its proposal to construct a

market costing an estimated $275,000. This, too, was unsatisfactory to Shopping Bag.

However, on April 18, 1955, Shopping Bag, by letter, submitted to defendant *its* proposal (Exhibit 3) consisting of a counteroffer, setting forth the terms and conditions upon which it would be willing to enter into a lease, and proposing that defendant either accept it according to "the terms and conditions" therein, reducing the same to a formal lease within 60 days, or use the letter as Shopping Bag's acceptance of defendant's offer of April 14 "as modified" by its terms and conditions. Defendant protested the terms as not acceptable and, in an attempt to resolve defendant's objections, Uhlmann arranged a conference at Shopping Bag's offices on May 5, 1955, at which Burke, Uhlmann, Shapiro, Hayden and a Mr. Holland were present.

The evidence is in conflict as to what occurred at this meeting, but viewing it in the light most favorable to respondent, it is clear that a discussion of defendant's finances took place. Hayden insisted that defendant build a market, similar to Shopping Bag's new Palmdale store, of brick construction with a unit for refrigeration, air-conditioning and heat, and other features not in the contemplation of defendant's plans. Shapiro advised those present that defendant had only $50,000 or $60,000 of its own cash to invest in a building. Based on the $26,400 minimum rental previously fixed by Shopping Bag, Hayden told him defendant could expect a loan of between $210,000 and $215,000, but that a larger loan was not possible. Knowing that the $26,400 was the most he could expect as minimum rental from Shopping Bag, Shapiro made it clear that the maximum of $60,000 cash, together with the $215,000 loan, making a total of $275,000, was defendant's limit for construction of the market. He stated he believed the cost of the building on which Hayden insisted would exceed the $275,000 limit and defendant could go no further with the deal until the cost of such building could be obtained. Hayden said he would authorize Shopping Bag's contractor, Mr. Hahn, to disclose the cost figures to defendant.

On May 11, 1955, Hahn advised Shapiro that the building would cost in excess of $300,000, of which Shapiro shortly thereafter informed Uhlmann. Defendant, before March 30, and on May 5, having fully presented the facts concerning its financial ability, plaintiffs then knew defendant could not execute a lease which would bind it to construct a building at such a cost.

At this point, the record is silent concerning any effort on the part of plaintiffs to influence Shopping Bag to reduce its demands or waive any of its requirements; nor does the evidence disclose that plaintiffs in any way sought to aid their principal by requesting Shopping Bag to increase the minimum rental or by working out a new proposal.

Negotiations having failed to materialize an agreement, defendant opened them with Fitzsimmons Thriftimart Markets, and on June 16, 1955, executed a formal lease on a building to be constructed by defendant on the same property.

Appellants contend there is no substantial evidence to support the trial court's finding that there was never a meeting of minds between defendant and Shopping Bag, and the counter-offer of April 18 was not accepted. They argue that although a formal lease was not executed, an agreement to lease and construct a building arose out of defendant's use of a copy of Shopping Bag's counteroffer of April 18 for zoning purposes.

■ Considering for the moment plaintiffs' oral contract of employment, before any obligation to pay a commission could arise, plaintiffs must obtain Shopping Bag as a lessee on ''terms and conditions satisfactory'' to defendant, for a market to be constructed on ''terms and conditions satisfactory'' to defendant. (Statement on Pretrial.) ■ As stated in *Ridgway* v. *Chase*, 122 Cal.App.2d 840, at page 847 [265 P.2d 603] : ''(t)he right of a broker to recover a commission must be measured by the terms of his contract (citations).

■ A broker may, by special agreement, make his commission dependent upon a contingency or the happening of a condition precedent, and unless such contingency occurs or such condition happens, he has no right of recovery (*Denbo* v. *Weston Inv. Co.*, 112 Cal.App.2d 153, 157 [245 P.2d 650].)''

■ As to performance, the courts require substantial observance of the terms of the contract (*Cochran* v. *Ellsworth*, 126 Cal.App.2d 429 [272 P.2d 904]). Said the court therein at page 439: ''(W)hen a condition precedent is adopted by the parties to a contract, the court will exact a substantial, if not a strict observance of the provisions before finding liability. (*Peterson* v. *Montgomery Holding Co.*, 89 Cal.App. 2d 890, 894 [202 P.2d 365]'' (*McKenzie* v. *Scottish etc. Co.*, 112 Cal. 548, 556 [44 P. 922]. ■ Therefore, before plaintiffs can recover a commission they must prove they obtained Shopping Bag as a lessee on terms and conditions satisfactory to defendant, for a market to be constructed on terms and

conditions satisfactory to defendant. That plaintiffs have failed to sustain their burden of proving these contingencies occurred to entitle them to a lease commission, is clear from the record before us.

Shopping Bag's proposal of April 18 constituted a counter-offer. It was conditional on defendant's acceptance of its terms and did not constitute Shopping Bag's unqualified acceptance of defendant's offer of April 14, which it had already rejected. For any agreement to arise out of the counteroffer, by its very terms, either defendant had to accept the terms and conditions set forth therein, or use it as Shopping Bag's acceptance of defendant's offer of April 14 "as modified" by the terms of the counteroffer. In any event, defendant had to agree to Shopping Bag's conditions.

It is generally recognized that "(B)efore a broker is entitled to compensation, the negotiations which he is authorized to make must be concluded or conducted to the state where, as to all material or essential terms of the sale, there is a meeting of the minds or an agreement between the principal and the customer produced by him; but if the principal and the customer are unable to come to terms, the broker cannot recover (citations)." (*Lawrence Block Co.* v. *Palston*, 123 Cal.App.2d 300, 307 [266 P.2d 856].)

The record amply supports the finding that the parties were unable to and did not come to terms. Negotiations were never concluded or conducted to a point where any of the essential terms of the counteroffer, which varied materially from those proposed by defendant on April 14, were agreed upon. These terms were basic, going to the very foundation of Shopping Bag's proposed agreement, relating to the proposed building, its rental, cost, construction, specifications, and so on. Certainly those proposed by defendant, based upon a $275,000 building were never unconditionally accepted by Shopping Bag; nor were those proposed by Shopping Bag accepted by defendant. "The acceptance of the owner's offer to lease must be unconditional to entitle the broker to a commission." (*Jacobs* v. *Schneider*, 152 Cal.App.2d 452, 457 [313 P.2d 142]; *Edwards* v. *Billow*, 31 Cal.2d 350 [188 P. 2d 748].)

In consideration of the terms of the employment contract, it is obvious that the cases holding that where a broker produces a person who is ready, willing and able to consummate a lease, he has earned his commission, are not in point. Nor is *Mann* v. *Mueller*, 140 Cal.App.2d 481 [295 P.2d 421], relied

upon by plaintiffs, where the essential provisions had been agreed to and only the formal lease had to be prepared.

Conceding that no formal written lease was ever executed, plaintiffs claim that in presenting to the Planning Commission a letter written by defendant, dated May 5, 1955, enclosing a photostatic copy of the counteroffer of April 18, and advising the Commission it had entered into a lease with Shopping Bag, defendant "used" the counteroffer in a manner constituting an acceptance of its terms. We find no substantial support for this contention either in the record before us or in the law of this state.

The evidence shows that for some time defendant had pending before the Planning Commission its request for additional C-4 zoning. In its original offer of March 30, defendant sought Shopping Bag's cooperation in the matter, which it rejected. On May 5, after the conference, "in an effort to get additional zoning for parking" (Appellants' Opening Brief, p. 4) and for the purpose of showing a demand for a shopping center in the area so additional commercial zoning could be obtained, defendant wrote a letter directed to Robert Groman, Chairman (Exhibit 7), informing the Commission that since its case was originally heard by it "an agreement has been reached with Shopping Bag Market Stores, on the terms of a lease . . ." and enclosing a photostatic copy of Shopping Bag's "letter of acceptance to our proposal to lease."

In arguing that the letter not only declares an agreement to lease was entered into, but that defendant's use of the photostatic copy of the counteroffer constituted its acceptance thereof, appellants lose sight of the substantial evidence in the record showing defendant's lack of intention and ability to be bound by the terms of the counteroffer. Plaintiff Burke, himself, personally presented defendant's letter to the commission. He could not have helped but know the sole reason for its presentation—to favorably influence the commission's action; and that the negotiating parties were nowhere near a meeting of the minds, having immediately before, on the same day, attended the conference of May 5. Plaintiffs were familiar with Shopping Bag's operations and long before April 14 knew what "kind of a deal" it would make with defendant. They knew their principal's financial ability—its source and limits under the $26,400 minimum rental Shopping Bag had offered. If any doubt existed in this matter, it was made abundantly clear to all parties at the May 5 conference that defendant simply could not accede to Shopping Bag's

demand to build a market in excess of $275,000. Defendant having already declared its financial position and limitation to a $275,000 construction, it is a reasonable inference from this, and other evidence, that both plaintiffs and defendant knew from Hayden's conversation the cost would be in excess of $275,000 and defendant could not and would not be able to meet his terms; yet it delayed rejecting them until it was certain the costs were not around the $275,000 figure. Between May 5 and May 11, when defendant finally determined the cost would exceed $300,000, all parties knew the terms were still under discussion.

As to the "use" contemplated by Shopping Bag to constitute an acceptance, the counteroffer provided: ". . . that the terms and conditions proposed herein be reduced to a formal lease within 60 days from the date of this letter. Otherwise, you may use this letter as our acceptance of your proposal of April 14, 1955, as modified herein." It is clear from this writing that the "use" as an acceptance was intended to apply only between the parties, not between defendant and a stranger; that the "use" for zoning purposes was not within the consideration of Shopping Bag since zoning was a collateral matter to the counteroffer, Shopping Bag having already rejected defendant's request to aid it in its zoning program; that defendant could, if it so desired, consider the letter as Shopping Bag's acceptance of defendant's April 14 offer as modified therein and not, as contended by plaintiffs, defendant's acceptance of the counteroffer; that however the term "use" might be construed, and the ultimate agreement might arise, the *only* "deal" Shopping Bag would make was one incorporating its own terms. Defendant's dissatisfaction with, refusal to accept, and inability to comply with Shopping Bag's terms are supported by substantial evidence. Nor have plaintiffs pointed out any place in the record wherein Hayden, or anyone else, on behalf of Shopping Bag, seeks to be bound by any "acceptance" of defendant. The "use" was never communicated by defendant to Shopping Bag and the parties at no time conducted themselves toward each other as ever having agreed. As between the two corporations, there is no claim that any agreement to lease or lease exists. Certainly no one on behalf of Shopping Bag so testified.

On May 25, 1955, defendant wrote another letter to Groman (Exhibit 9) in part stating: "We want to affirm that this is not a speculative deal in any manner whatever. We have a lease with a national super market, a chain, for a 30,000 square

foot market. We will invest $300,000 in this market. . . ." The trial court obviously believed the testimony of Shapiro that the "lease with a major super market" referred not to one with Shopping Bag, but with Thriftimart, with which defendant then had "a complete meeting of the minds on all terms and conditions." Nothing in the letter refers to Shopping Bag, and in view of his testimony and other evidence in the record, we cannot accept the plaintiffs' construction of the word "affirm" as a reaffirmation that an agreement had been reached with Shopping Bag. It means no more than that defendant wanted to positively state to the Commission that the deal it had (with Thriftimart) was not speculative. It could not refer to a nonexistent lease with Shopping Bag on a building to be constructed at a cost of $343,000. There is no more in the record to infer Shopping Bag reduced its demand to $300,000, than that it reduced it to the $275,000 defendant could afford. This letter, too, was written, as admitted by appellants "as a part of the defendant's continued program to obtain zoning for additional parking facilities."

Appellants claim that the only evidence Shopping Bag's proposed market would cost in excess of $300,000 came into the record by way of Shapiro's testimony concerning a conversation with Hahn, which constituted inadmissible hearsay. They argue Hahn was not called as a witness and the evidence of cost rested solely upon his veracity and competency. In the first place, it was Hayden, President of Shopping Bag, who on May 5, in the presence of both plaintiffs, authorized Hahn, its contractor, to talk to Shapiro concerning the cost, after which Shapiro related it to Uhlmann. Secondly, whether Hahn was correct in his estimate of over $300,000, and the figure is factually true, is not the important factor here involved—but that the figure, accurately or not, was actually given. This goes to the question of defendant's intent and good faith which has been repeatedly questioned by plaintiffs. Hahn was present in Los Angeles at the time of trial and if plaintiffs doubted that a conversation took place, or that the $300,000 plus figure was given, plaintiffs could have called him as a witness since he was as available to them as to the defendant. They chose not to do so.

Plaintiffs cite *Hobbs* v. *Massasoit Whip Co.*, 158 Mass. 194 [33 N.E. 495] and *Standard Iron Works* v. *Globe Jewelry & Loan, Inc.*, 164 Cal.App.2d 108 [330 P.2d 271], for the proposition that the conduct of an offeree may constitute an acceptance of an offer resulting in a binding contract. In

the case at bar we are faced not only with circumstances entirely incompatible with conduct of acceptance, but with an action between one party and a third in which the original negotiating parties themselves do not seek to be bound.

The trial court's finding that there was no meeting of the minds and the counteroffer was not accepted is amply supported by substantial evidence in the record before us. Plaintiffs had the burden of proving they fully executed their contract and that nothing remained to be done but to pay the commission; or in the absence of such showing, that complete performance was prevented by defendant. Plaintiffs did not sustain their burden of proof on the issue of full performance and having failed to perform their undertaking to procure Shopping Bag as a lessee under the terms of their contract, they are not entitled to a commission (*Jacobs* v. *Schneider*, 152 Cal.App.2d 452 [313 P.2d 142]).

This brings us to appellants' second contention that plaintiffs' complete performance of the contract was prevented by defendant and that the trial court's finding to the contrary is without evidentiary support. They refer to the rule and cases in support thereof, that even though a broker's commission is absolutely dependent upon the consummation of a transaction, the principal may not defeat the broker's right thereto by acting in bad faith and preventing the completion of the transaction.

In the instant case, this issue is primarily factual and we are concerned only with the question whether the court's finding that defendant did not frustrate and prevent plaintiffs' performance of the contract is supported by substantial evidence. We hold that it is.

Plaintiffs argue that under the counteroffer of April 18, 1955, Shopping Bag gave defendant 60 days within which to accept its terms, and before the 60-day period expired, defendant negotiated with Thriftimart and executed a lease on the same property on June 16, 1955, without the knowledge of plaintiffs or Shopping Bag, thereby preventing plaintiffs' negotiation of the lease.

Of course, the 60-day period mentioned could not concern defendant unless it intended to accept the counteroffer, and, since it did not, it could not prevent defendant's negotiations with someone else. Free to deal with another, defendant had no duty to inform plaintiffs who, as defendant's agents, and closely associated with Shopping Bag, must have known nothing further was pending between them. Nowhere in the

record is there any showing that had defendant not executed a lease with Thriftimart, Shopping Bag would have acceded to the terms of defendant's offer resulting in a lease, or that plaintiffs could have presented, or did offer, to defendant a Shopping Bag lease which would have been satisfactory to it.

The evidence shows that negotiations between Shopping Bag and defendant failed, not because of any wilful fault or prevention on the part of defendant, but because Shopping Bag's proposed lease and market were not on "terms and conditions satisfactory" to defendant. Because of the counter-offer, defendant was no longer under any obligation to proceed further under its offer of April 14, nor was it obliged to continue discussion with Shopping Bag under its counter-offer after it was obvious to all it could not, and would not, accept its terms.

Unless it can be said that defendant wilfully prevented plaintiffs' performance of the contract merely by failing to come to terms and by being unable to meet Shopping Bag's demands to construct, through an outside contractor, a brick building with special heating and cooling units and other features, in excess of $78,000 over the amount to which all parties knew defendant was limited, we fail to perceive in what way defendant could be guilty of any fault actionable under the law. Failure of negotiations in which there is merely an inability to agree on terms, cannot constitute the kind of "fault" or "bad faith" or "unfair and dishonest dealings" expressed by our courts in the cases cited by appellants. We briefly list appellants' "illustrations of bad faith" on the part of defendant: (1) after using the counter-offer for zoning purposes, defendant now contends it never accepted Shopping Bag's counteroffer and no negotiations were pending after their meeting of May 5; (2) by letter of May 12, Uhlmann submitted to defendant a form of lease used by Shopping Bag for its consideration; that neither defendant nor its counsel examined it and Shapiro led him, after "repeated inquiries" to believe otherwise; (3) following May 5, plaintiffs continued to act for defendant by attempting to secure ice cream concessions and a coffee shop for the balance of defendant's proposed shopping center and continued their efforts to obtain additional zoning; and (4) defendant did not attempt to withdraw from Shopping Bag's negotiations until its letter of June 27, 1955.

We again refer to the rule that in reviewing the evi-

dence on appeal, it is not the function of this court to weigh it, determine the credibility of the witnesses or resolve factual conflicts. If there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trial court, we are bound thereby (*Juchert* v. *California Water Service Co.*, 16 Cal.2d 500, 503 [106 P.2d 886]).

Although plaintiffs claim they continued to act for defendant in connection with its shopping center and zoning application, nothing in the record discloses that plaintiffs ever did anything after May 11 *in furtherance of the proposed lease.* Plaintiffs, with knowledge that the $26,400 minimum rental fixed by Shopping Bag prevented defendant from obtaining a loan in excess of $215,000 made no effort to influence Shopping Bag to increase the amount in order to expedite a larger loan, to approve the terms proposed by defendant, or to waive the conditions demanded by it in its counteroffer; nor is there any evidence plaintiffs thereafter attempted to obtain Shopping Bag's consent to accept the type of building defendant could afford to construct, or advised defendant that they could negotiate a satisfactory lease with Shopping Bag. If plaintiffs knew they could negotiate a lease with Shopping Bag on terms and conditions favorable to defendant after May 11, they did not communicate such fact to their principal. Plaintiffs' alleged activities in attempting to secure ice cream concessions and a coffee shop for defendant's proposed shopping center, and additional zoning, do not appear to have been in furtherance of the lease negotiations with Shopping Bag, particularly in view of the basic reason for their failure to agree.

As to the lease plaintiffs submitted to defendant on May 12, the trial court was justified in believing the testimony of Shapiro, who denied Uhlmann made inquiries of him concerning it during May, 1955. Reasonable inferences from Uhlmann's letter of June 13, 1955, would seem to bear this out. In any event, we fail to see the materiality of this matter for the lease was no more than an incompleted "Standard Form" generally used by Shopping Bag. It contained none of the terms and conditions discussed by either party. As to the June 27 letter to Shopping Bag, from all of the circumstances it could constitute little more than an act of courtesy. We are convinced that defendant's negotiations ended May 11 only because the parties could not come to terms, and no further efforts, particularly on the part of plaintiffs were made toward renewing the same.

Appellants repeatedly charge defendant with bad faith, misdealing and surreptitious conduct. We note from the record that plaintiff Uhlmann, who was familiar with Shopping Bag's operations and dealt with it considerably before March 30, 1955, and who was associated with Burke at the request of Shopping Bag, is now employed by Shopping Bag Food Stores as the officer in charge of real estate. At all times, Uhlmann knew the "kind of deal" Shopping Bag would make and that the cost of the building it demanded would exceed $300,000, yet in preparing the draft of its offer of April 14 for defendant, he omitted entirely any reference to his principal's $275,000 limitation, which he well knew was the basis of the offer. Despite Uhlmann's failure to include it, defendant did so and Shopping Bag refused to accept the offer. It is apparent that plaintiffs, with full knowledge their principal could not meet such demands, were willing to obligate it to a contract in excess of its ability to perform. Prior to March 30, Uhlmann and Hayden had conferred considerably concerning the terms of a lease Shopping Bag would offer defendant—in fact, when Uhlmann submitted defendant's offer of March 30, Hayden admonished him for bothering him with it when he (Uhlmann) knew he was "not going to accept it," and had already been told the only "kind of deal" Shopping Bag would make. Facts as to defendant's financial ability were fully presented to both plaintiffs prior to March 30 and during the May 5 conference. In any event, it is unrealistic to even suggest that having undertaken to represent defendant they would not have known the financial position of their principal at all times. In view of Uhlman's connection and prior dealings with Shopping Bag, it is inconceivable to us that he did not at all times know exactly what it demanded, and how much the building it wanted would cost. Perhaps he realized long before the negotiating parties that they would never be able to agree. The trial court undoubtedly took the matter of the relationship of the parties, as well as plaintiff Uhlmann's good faith, into consideration in determining the credibility of the witnesses and weighing the evidence.

Appellants finally contend that the trial court erred in granting Shapiro's motion for nonsuit. In this connection we view the evidence in a light most favorable to plaintiffs, disregard that which is unfavorable and draw every reasonable inference therefrom in plaintiffs' favor. Having done so, we find no error.

Plaintiffs argue that Burke, having been hired by Shapiro pursuant to an oral contract and no proof having been offered that he was not acting on his own behalf, as well as on behalf of the corporate defendant, it may reasonably be inferred the agreement was with Shapiro individually. Since Herbert Shapiro was sued individually, the burden was upon plaintiffs to prove he acted in that capacity. This they did not do. Plaintiffs stipulated on pretrial "that Herbert Shapiro is the president of North Whittier Highlands, Inc., and handled the negotiations and discussions on behalf of said corporation." This, of course, would not preclude proof he also acted individually, but we are unable to find in the record any evidence offered in support of their allegation. Nor have appellants pointed out any evidence to substantiate their claim of error. In fact, their own Statement of Facts points to the contrary. It mentions no employment by Shapiro, but declares that plaintiff Burke was employed by North Whittier Highlands, Inc., as does their stipulation of facts on pretrial "(T)hat plaintiff Burke was employed during the month of March, 1955, *by defendant* North Whittier Highlands, Inc. . . ." and "it was understood between the *corporation* and said broker . . . *it* would be obligated. . . ." (Emphasis added.) The so-called lease plaintiffs claim they sent to Shapiro as an individual on May 12, and which he did not submit to the corporation, was merely the "Standard Form" of lease generally used by Shopping Bag, unsigned, containing none of the terms and conditions discussed between defendant and Shopping Bag; and addressed to Shapiro, not individually, but as president of the corporation.

Although plaintiffs declare the judgment of dismissal on motion for nonsuit was "wholy unsupported by the evidence" they have failed to demonstrate in what way the evidence would sustain a judgment against Herbert Shapiro individually.

For the foregoing reasons the judgment is affirmed.

White, P. J., and Fourt, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 8, 1959.